ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAR 2 0 2002

CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HOWARD LONGMAN, et al., On Behalf of Themselves and All Others Similarly Situated, | § § § § | Civ. Action No. 3:97-CV-3102-L |
| PLAINTIFFS, | § § § | |
| v. | § § § | CLASS ACTION |
| PHYSICIANS RESOURCE GROUP, INC, et al., | § § § § § | |
| DEFENDANTS. | § § | |

## LEAD PLAINTIFFS' AMENDED COMPLAINT ALLEGING FEDERAL SECURITIES VIOLATIONS

43

## INTRODUCTION AND OVERVIEW

1.     This is a class action on behalf of all persons who purchased or otherwise acquired the stock of Physicians Resource Group, Inc. ("PRG" or the "Company") between September 15, 1995, and November 19, 1997, inclusive (the "Class Period"), alleging that defendants violated the Securities Exchange Act of 1934 (the "1934 Act") by engaging in a scheme and course of business that operated as a fraud on the Class.  During the Class Period, PRG's top officers falsified its reported profits while issuing false statements and omitting to inform investors of known, material, adverse, non-public facts about the Company's operations, its purported success in integrating acquisitions, including their operating efficiencies and cost savings, and its future earnings per share ("EPS") growth. These false statements and omissions drove PRG's stock to an all-time high of $34-3/8 per share in May 1996.  The Company's insiders made these false statements to artificially inflate the stock price so that PRG could sell 4.25 million new shares at $28.50 per share and raise $115 million; issue (sell) over 14 million shares to complete the acquisitions of more than 150 ophthalmic and optometric practices during 1996-1997; and sell new convertible debentures and raise $125 million.  The Company's outside auditor, Arthur Andersen & Co., LLP ("Andersen"), falsely certified PRG's 1995 and 1996 financial statements so that it could retain its lucrative consulting practice with the Company, and maintain and increase its market share in Texas and the managed-healthcare industry.

2.     During the Class Period, PRG and the Individual Defendants issued very positive statements about the business and their acquisition program, while reporting profitable current operations and forecasting strong EPS growth for 1997 and 1998. According to Individual Defendants' present-tense or historical statements, PRG *had "successfully integrated* the 10 founding practices," and its huge EyeCorp acquisition "advance[d] [the] overall Company strategy."  They represented to investors and to the physicians at acquired practices that PRG provided "sophisticated management information systems," and that "PRG *has* strong operational and financial controls *in place*" "to control its rapid growth and to manage its current operations."  Investors were also told

- 1 -

that the Company performed careful and thorough due diligence to assure that the acquired practices were of the quality necessary to meet its standards so that they could be successfully integrated into PRG's operations. And when the Company announced the American Ophthalmic and EquiVision acquisitions in October 1996, it stated that they "bring us significant operational infrastructure."

3.     By late-March 1997, the Company provided management services to 151 practices, with 414 ophthalmologists and 223 optometrists at 387 locations in 25 states. The Company, whose stock was traded on the New York Stock Exchange, sold itself to the market, and to the physicians whose practices it promised to manage, as very profitable because it was expert in managing and developing ophthalmic practices – PRG was a company with an important niche in an important industry. In particular, PRG claimed that its consolidation of affiliated practices would prosper from synergies, cross referrals, and economies of scale, and it would deliver all of this in return for 35% of the amount that the physician would take home after paying the expense of running the practice. This promise was persuasive, particularly as the eye-care specialty was growing in response to rapid technological change – more treatments per patient – and the inevitable demographics of an aging population – more patients. And all of this was taking place as managed care was engulfing the nation, putting unaffiliated practices in precarious positions. PRG spoke simultaneously to two audiences: the market for its stock and doctors for their practices. To the investor who asked: "How does PRG make its money?" the Company answered: "By collecting 35% of the amount that the doctor would net after paying the expense of running the practice." And to the doctor – PRG's customer – who asked: "What services do I get for the 35% fee that I pay?" the Company answered: "You get expert practice management and development services, which are already in place, that will cut your costs while bringing more business to your existing practice and expanding it by promoting your merger with competing practices."

4.     To make these promises sound credible, PRG claimed that it had the required infrastructure to integrate and manage this mass of practices, including the necessary

accounting and medical-practice management information systems and the expert staffs to operate them. Individual Defendants also claimed that the Company had the clout to bring lucrative managed-care contracts to the acquired practices, and to negotiate prices lower than otherwise attainable by individual practices for their supplies, products, equipment and insurance. PRG further claimed that it had the staff necessary to expand the individual practices' scope by developing and implementing marketing campaigns for ancillary\services, such as laser surgery, by negotiating and implementing the roll-in of new practices, and by enabling several practices to share the services of subspecialists, such as retinal surgeons. To be sure, these claims persuaded investors to buy shares and doctors to affiliate their practices with PRG. After all, doctors would get their money's worth in concrete practice-management and services in return for the 35% fee. And since the doctors purportedly represented the source of an ever-increasing stream of 35%-net-revenue bases, investors saw PRG as a sound investment. This was a simple deal: investors would prosper as PRG's delivery of its promised services caused the doctors to prosper.

5. Alas, Individual Defendants' promises were a fraud. Contrary to their public statements, PRG had none of the expert personnel, systems, or clout necessary to consolidate, let alone manage its affiliated practices. In fact, the doctors' staffs continued to operate the practices, paid from the practice revenue as before the PRG affiliation. When doctors demanded the promised services, PRG responded that, by its reading of the service agreement, the doctors' staffs – now listed as Company employees – were obligated to provide those services.

6. Consequently, the affiliated doctors suffered under this scam. Many of them, plus former PRG executives and directors as well, have come forward to explain that the Company failed to deliver the services it promised – there were none at the outset and none were developed during the Class Period. These witnesses provide details of PRG's failures, including bollixed payrolls, irreconcilable accounting, commingled funds, failure to deliver managed-care contracts, bungled negotiations that caused lucrative mergers to fail, plus the inability to keep current on coding issues, which were crucial to practice

management. These failures were not incidental to PRG's business. Rather, they exemplify the Company's knowing failure to deliver the essential product of its business: the Company took the 35% fee in return for the management and development service it promised, but never delivered, while misleading the market that it was successfully filling its important niche and growing in the process.

7.     As PRG failed to deliver on its promises, doctors, beginning in 1996 and continuing throughout the Class Period, complained to the Company's top management, including Individual Defendants. By the time of the Annual Providers' Meeting in Dallas, in March 1997, PRG's executives devoted considerable attention to these growing problems, particularly the failure to provide an integrated accounting system, which left the Company unable to produce meaningful financial statements to either the doctors or to the SEC. PRG's auditor, Andersen, reported in 1997 that the Company's accounting controls failed to meet the Generally Accepted Accounting Principles. Left without timely or accurate financial statements, doctors began to withhold their 35% fee, thus cutting PRG's *sole* revenue source. But the Company ignored the reality of the storm and continued to recognize revenue as if the sky remained blue. In withholding the truth from the market, PRG created a revenue-recognition problem that ran along several dimensions: it recognized revenue as the individual practices deposited funds into a joint account, *even though PRG delivered no service in return*, and the Company's reported revenue was improperly estimated without a reasonable basis in the revenue and expense reports of the individual practices.

8.     As part of this scheme to inflate the stock price, Andersen issued unqualified audit opinions, which certified that the Company's financial statements were prepared in accordance with GAAP for fiscal 1995 and 1996 and that its audits had been performed in accordance with Generally Accepted Auditing Standards ("GAAS"). These statements were false. The auditor knew or recklessly disregarded that PRG could *not* generate accurate financial statements, and its management and internal-control systems were so inadequate that its financial statements were unreliable. Andersen also knew or recklessly disregarded

- 4 -

that the Company's reported annual and quarterly revenues and net income for 1995, 1996, and 1997 were materially misstated.

9.    In knowing and reckless disregard for the truth about PRG's lack of adequate internal and management controls, Andersen falsely reported that the Company's financial statements for the years ended 12/31/95 and 12/31/96, respectively, were stated in accord with GAAP. And to pursue the possibility of acquisition by an outside company, and to allow PRG and Andersen to reap substantial monetary benefits, the Company's outside auditor hid the fact that PRG's internal and management controls were so deficient as to be virtually useless and that the newly acquired EquiMed practices – worth substantially less than what PRG had represented in 11/96 – would require a huge write-off because of asset-valuation losses.

10.    By 11/19/97, the full extent of PRG's problems was revealed. Its Chairman and CFO were fired, it would take $31.75 million in special charges for uncollectible accounts receivable and practice closings, which would result in a huge – over $18 million – third-quarter loss in 1997, its aggressive acquisition program had been abandoned, and the Company was no longer looking to be acquired by an outside company. On this news, PRG's stock collapsed to as low as $2-5/8 per share – 93% below its Class Period high. In an 11/20/97 article in the *The Wall Street Journal*, PRG admitted that the charges it was taking were, in large part, a result of the practices it acquired from EquiMed in 11/96, and that EquiMed had overstated the value of the acquired practices.

11.    The picture of profits, growth, and successful operations painted by PRG's top executives during the Class Period was a fiction because the Company's business was out of control. Contrary to defendants' representations, management had neither the expertise, experience nor the infrastructure – in place or planned – to successfully pursue their rapid-fire acquisition program. With no accounting and management-information systems – and no substantive efforts ever made to create them – PRG knew it could not integrate its acquisitions while its accounts receivable ballooned as doctors refused to pay

the 35% management fee, and that the Company's reported profits were phony – created by illegal accounting manipulations and unsustainable business operations. As a result, investors and the affiliated physicians whose eye-care practices PRG acquired were cheated out of hundreds of millions of dollars.

12.     On February 1, 2000, the Company filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code in the Northern District of Texas.

13.     The graph below charts PRG's stock price during the Class Period as Individual Defendants completed scores of acquisitions, and illustrates the stock-price collapse as previously concealed facts about the Company's business emerged:



## JURISDICTION AND VENUE

14.     Jurisdiction exists pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.  The claims asserted arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.

15.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts giving rise to the violations complained of occurred in this District.

16.     Defendants used the instrumentalities of interstate commerce, the U.S. mails, and the facilities of the international securities market.

## THE PARTIES

17.     Lead Plaintiff the Alpert Group purchased over 1,365,000 shares of PRG stock during the Class Period and was damaged thereby.

18.     The Individual Defendants were PRG's top officers and directors: Emmett E. Moore ("Moore") was, until he was fired in November 1997, Chief Executive Officer, President, and Chairman of the Board; Richard M. Owen ("Owen") was, until he was fired in the fall 1997, Chief Financial Officer (and President in August 1997) and a director; Richard J. D'Amico ("D'Amico") was Executive Vice President and Chief Administrative Officer; and John N. Bingham ("Bingham") was the Controller, Vice President, and Chief Accounting Officer.

19.     Because of their positions, Individual Defendants knew the adverse, material, non-public information about the Company's business, as well as its finances, markets, and present and future business prospects via access to internal corporate documents (including operating plans, budgets, and forecasts, and reports of actual operations compared thereto), communication with other corporate officers and employees, attendance at management and Board meetings, and other information provided to them. During the Class Period, Moore, Owen, D'Amico, and Bingham participated in the issuance of false or misleading statements, including the preparation of false and misleading press releases, dissemination of false statements during presentations at securities conferences,

roadshows, analyst conference calls, and during individual conversations with securities analysts. In addition, PRG filed numerous documents with the SEC that contained false and misleading statements signed by Moore, Owen, Bingham, and D'Amico. For example, each of these defendants signed PRG's Form S-1 Registration Statement dated May 14, 1996; and Form S-4 Registration Statements dated July 17, 1996 and January 2, 1997. Moore, Owen, and Bingham signed PRG's Form S-4 Registration Statements dated February 14, 1996, May 3, 1996, and August 9, 1996, and Moore, Owen, and D'Amico signed a form S-3 Registration Statement dated June 5, 1997.

20.     Andersen, a firm of certified public accountants, and its Houston and Dallas offices, was engaged by PRG to provide independent auditing, accounting, and consulting services throughout the Class Period, and to audit and opine on the Company's 1995 and 1996 financial statements. It also reviewed and approved PRG's interim quarterly results and consulted about its internal control and management-information systems. The auditor falsely represented that PRG's financial statements for 1995 and 1996 were presented in accordance with GAAP and that its audits of the financial statements had been performed in accordance with GAAS. Andersen also consented to the use of its reports on financial statements in PRG's Form S-4 Registration Statement dated May 3, 1996, its Form S-4 Registration Statements dated July 17, 1996, August 9, 1996, and January 2, 1997, and its Form S-3 Registration Statement dated June 5, 1997. The auditor's issuance of materially false opinions on PRG's 1995 and 1996 financial statements and its consent to the use of its reports in the Registration Statements were violations of GAAS.

## CONTROLLING PERSONS

21.     Until they were fired, Moore and Owen, by reason of their executive and Board positions were controlling person of PRG and had the power and influence, and exercised the same, to cause the Company to engage in the conduct complained of.

- 8 -

## INDIVIDUAL DEFENDANTS' KNOWLEDGE AND DUTY
## TO DISCLOSE OR ABSTAIN FROM STOCK SALES

22.     During the Class Period, each Individual Defendant occupied a position that made him privy to non-public information concerning PRG. Because of this access, each of them actually knew the material, adverse, non-public facts alleged and knew that they were being concealed. Notwithstanding their duty to refrain from causing the Company to sell stock or other securities while it was in possession of material, non-public information, Individual Defendants caused PRG to sell over 18 million shares of its stock and $125 million of subordinated debentures, thus benefitting from their fraudulent scheme and course of business.

23.     Each defendant is liable for making false and misleading statements and for participating in a fraudulent scheme and course of business that operated as a fraud on purchasers of PRG's stock, damaging Class members in violation of the federal securities laws. Defendants pursued a common goal to inflate the Company's stock price by making false and misleading statements and concealing material, adverse information. The scheme and course of business was designed to and did deceive the investing public, including plaintiffs and other Class members, into buying PRG's stock at artificially inflated prices, and doctors into selling their eye-care practices to the Company.

## INDIVIDUAL DEFENDANTS' MOTIVE

24.     The Company's top officers had strong motives to inflate its stock price. They wanted to pursue an accelerated acquisition program, because growth by acquisition provided the *only* way that they could foster the perception in the business community that PRG was a "growth" company, thereby ensuring a substantially inflated stock price, and ensure an increasing revenue stream from the 35% management fee. Because the Company did not have the cash necessary to pay for the acquisitions, PRG had to pay for them by issuing or selling stock or securities related to its stock to raise cash to pay for part of the acquisition prices. That is, the higher the stock price, the fewer shares had to be issued. A high stock price was also important to Individual Defendants because a material

part of their net worth consisted of PRG's stock and the Company needed to maintain the appearance that it was profitable.  Thus, inflating and maintaining the inflated price of PRG's stock was key to Individual Defendants' scheme, because doing so enabled them to:

(a)  sell 4.25 million shares of new stock to public investors to raise $115 million in new capital;

(b)  effect the sale of $125 million of convertible debentures to investors;

(c)  issue (sell) more than 14 million shares of common stock to make acquisitions, but by artificially inflating the stock price they reduced the number of PRG shares to be issued in connection with its acquisitions, thus lessening the dilutive affect of the acquisitions; and

(d)  near the end of the Class Period, attempt to sell the Company and still reap substantial rewards even though PRG was no longer profitable.

## ANDERSEN'S MOTIVE

25.  Andersen was motivated to review and approve (*i.e.,* certify) the Company's allegedly false financial statements by its desire to retain PRG as a client, continue to generate the substantial fees from its audit and review engagements, and secure additional business from the Company, including the more profitable consulting business.  The partners responsible for the PRG engagement, based in the Dallas and Houston offices, were particularly motivated to participate in the wrongdoing alleged because their incomes were directly tied to the fees generated from the engagement. Andersen frequently offered its audit partners bonuses based on consulting business they generated such that the audit partners were even more motivated to acquiese to client's wishes. Andersen and its auditors were also motivated to avoid any disagreements with PRG's management because the potential for future employment was a substantial consideration, given that several former Andersen auditors were employed by PRG in lucrative management positions, including, among others, Moore, Owen, and Bingham.  It also wanted to maintain and increase its market share for auditing, accounting, and consulting services in Texas and also in the managed-care industry.

- 10 -

## PRG'S FAILURE TO ADEQUATELY DISCLOSE RISKS

26.    Through boilerplate statements that were repeated verbatim in the June 23, 1995, IPO Prospectus, and subsequent prospectuses filed on February 14, 1996, May 14, 1996, July 27, 1996, August 15, 1996, August 21, 1996, and January 2, 1997, the Company purportedly warned that "there could be no assurances" about its ability to successfully integrate new and future acquisitions; future growth and profitability associated with its acquisition strategy; and its ability to successfully provide management services. These generic warnings do not insulate PRG and Individual Defendants from liability resulting from their fundamental failures in these curcial aspects of the Company's business. In fact, PRG's purported warnings expressly conflict with the specific information that was repeatedly told to the investing public (*see* ¶¶27-66), but which was knowingly false when made (*see* ¶¶77-137).[1]

## INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

27.    Throughout the Class Period, PRG issued a "Fact Sheet," which described the Company's business model:

> *PRG develops integrated eye care delivery systems* through affiliations with locally prominent eye care practices.... The Company *provides its affiliates* with *management expertise* [and] ... *information systems* ....    This strategy allows PRG networks to offer lower cost, coordinated, comprehensive eye care service programs in each market with increased quality of care. [*See* ¶¶77-100.]

> *    *    *

> Through an aggressive operations acquisition strategy[,] PRG *is building a comprehensive network of eye care affiliates* [that] ... enables cost reduction strategies, providing network affiliates a competitive advantage in their markets. [¶¶126-133]

> Benefits to Affiliated Practices

> PRG's acquisition and consolidation strategy helps its affiliated practices *take advantage of*:

> >    *Operating cost efficiencies* [¶¶77-79, 87, 126-133].

---

[1]The bracketed notations refer to paragraph references within the complaint which support plaintiff's contention that each statement was false or misleading when made.

- 11 -

\* \* \*

> *Sophisticated management information systems* [¶¶77-100].

\* \* \*

*As PRG provides management and administrative support, the amount of time eye care professionals must spend on distracting administrative matters is severely reduced.* This enables them to dedicate more time to the growth of their professional practices. [¶¶77-100, 129-130].

*At the local level, cost efficiencies are achieved through the consolidation of administrative office management activities and the sharing of facilities* ... thereby reducing and more efficiently utilizing personnel. [¶¶126-133]

*At a national level, physician practices benefit from ... information systems technology* .... [¶¶77-100]

28.    On 9/18/95, PRG announced it would acquire EyeCorp – its largest competitor – for about 6.9 million shares of the Company's stock.  According to Moore, the transaction "*clearly makes us the leader in the eye care industry*," boosting PRG's earnings by 8%-10% in 1996 and even higher if it realized certain "*expected benefits*" from the transaction.

29.    On 9/26-27/95, Moore, D'Amico, Owen, and Bingham made a presentation to the Smith Barney Physicians Practice Management and Health Care Technology Conference at the Plaza Hotel in New York City.  They told securities analysts, portfolio and money managers, institutional investors, brokers, and stock traders in their presentation, and in separate break-out sessions, that:

- PRG's acquisition program was moving forward successfully.  [¶¶77-100]

- The Company had the management expertise and experience, MIS, and accounting systems and controls necessary to permit it to continue its growth-by-acquisition program.  [¶¶101-123]

- PRG had the personnel and expertise to do the necessary due diligence on acquisitions to assure that it was acquiring only high-quality, profitable practices that met its standards and could be quickly integrated into its operations.  [¶¶80-85]

- The Company was successfully integrating the practices it had already acquired and was not encountering any systems-integration difficulties that would adversely affect its ability to continue its acquisition program.  [¶¶77-100]

- The EyeCorp merger significantly advanced PRG's overall corporate strategy and positioned it to move forward with the successful integration of that acquisition and to continue its acquisitions at the current or an accelerated pace. [¶¶78-79, 116-117]

- The Company was forecasting EPS growth of 25%-35% over the next several years, including 1997 EPS of $1.10-$1.18. [¶¶80-85]

30.     On 2/14/96, Moore, D'Amico, Owen, and Bingham presented PRG to securities analysts, portfolio and money managers, institutional investors, brokers, and stock traders at the Smith Barney 1996 Health Care Conference at the Plaza Hotel in New York City. During their presentation, and in separate break-out sessions, they reiterated the representations made in New York in September 1995.

31.     On 2/20/96, the Company announced the acquisition of 10 eye-care practices for cash of $7.7 million and 1,439,611 shares of PRG stock worth $31 million, quoting CEO Moore:

> "The recently completed acquisitions significantly strengthen our position in the Houston (4 additional practices) and Las Vegas (2 additional practices) markets and represent substantial entries into new markets in Arizona, Oklahoma and northern Ohio. Achieving further market penetration through follow-up acquisitions, as we have in Houston and Las Vegas, is the first step in executing our Company's strategy of market consolidation. We look forward to the challenge of integrating these markets and assisting our physicians in providing high quality, cost effective eye care services and marketing such services to managed care." [¶¶77-100]

*   *   *

> Physicians Resource Group, Inc., is the nation's *leading provider* of physician practice management services to ophthalmic and optometric practices. PRG develops *integrated* eye care delivery systems through affiliations with locally prominent physician practices in strategic geographic areas across the United States. [¶77-100.] PRG acquires the operating assets of these practices and *develops the practices into eye care networks by providing management expertise, marketing [and] information systems* .... [¶¶126-133]

32.     On 3/18/96, CEO Moore announced the closing of the EyeCorp acquisition, which "*significantly advances our overall company strategy,* our acquisition pipeline and our presence in a number of key markets.... We are ... *ready to move forward with the successful future integration of the two companies as well as additional acquisitions.*" [¶¶77-100, 116-117.]

33.   The market and the acquired physicians were misled by Individual Defendants' false statements:

(a)   On 3/18/96, Smith Barney issued a report, written by Harris and Heston, repeating information provided them by Moore, D'Amico, Owen, and Bingham, which forecast 1996 and 1997 EPS of $.81 and $1.10, respectively, and a 33% five-year EPS growth rate, and stated:

> As a result of the EyeCorp merger and 10 additional acquisitions, PRG is now the largest manager of eye care practices in the country, with 70 practices, 17 ambulatory surgery centers and 256 eye care professionals located throughout 13 states. *From a purely financial perspective, these transactions were extremely positive for PRG*. In addition to *tripling the current revenue run rate* of PRG from $50-$55 million to around $165 million, we expect the deals to *add around $0.05 to 1996 EPS*....
>
> *       *       *
>
> *When selling their practices, ophthalmologists and optometrists – like anyone else – want to feel that they are going with the winner. After the recent transactions, PRG is clearly the leader in the eye care market*....
>
> PRG is achieving critical mass in several key markets. In addition to simply growing through acquisitions, a central strategy of PRG is the *creation of integrated eye care networks in its markets*. As a result of the recent transactions, PRG *is well on its way to achieving scale in key markets* ....

(b)   On 3/19/96, Volpe Welty issued a report, written by Rosenbluth and Dunn, repeating information provided them by Moore, D'Amico, Owen, and Bingham, – forecast 1996 and 1997 EPS of $.82 and $1.14, respectively, and a 35% three-year growth rate, and extolled the EyeCorp acquisition:

> Other Developments.  Though perhaps overshadowed by the EyeCorp merger, other significant developments have occurred since the IPO.  First and foremost, PRG *has successfully integrated the 10 "founding" practices* acquired concurrent with the IPO....

34.   On 3/26/96, PRG announced its fourth-quarter and 1995 year-end audited financial results.  Before dissemination to the investment market, the press release was reviewed and approved by Andersen, which told the Company that it had concluded its 1995 year-end audit field work, that the press release reflected its audit work, and it agreed to the issuance of the press release reflecting PRG's 1995 year-end audited financial

statements. Andersen knew, based on its vast experience as a public auditor for hundreds of publicly traded companies, that the market reasonably believes and relies upon the fact that year-end financial-results press releases are not published by a public company until after the auditor has completed its audit field work and has approved the release of the company's financial statements. The 3/26/96 press release stated:

> The merger with EyeCorp, the second largest practice management company in the eye care field, *establishes PRG as the preeminent leader in our industry*.... Emmett E. Moore, the Company's Chairman, President and Chief Executive Officer [said] "We believe PRG *is positioned to continue to take advantage of* the rapid changes that are occurring in the way health care in the United States is being delivered." [¶¶77-100, 126-133]

35. Also on 3/26/96, Moore, D'Amico, Owen, and Bingham held a conference call for securities analysts, money and portfolio managers, large PRG shareholders, institutional investors, brokers, and stock traders. During the conference call, and in one-on-one conversations, the Company's top officers stated that the Company was successfully integrating the practices it had already acquired and was not encountering systems-integration difficulties that would adversely affect its ability to continue its acquisition program. [¶¶77-100, 101, 103]

36. On 5/10/96, PRG issued a press release, which was reviewed and approved by Andersen before its dissemination, reporting "revenues for the three month period ended March 31, 1996 of $36.2 million .... Exclusive of the non-recurring merger expenses, income would have been $2.2 million or $0.13 per share on approximately 17.2 million shares." [¶¶85, 134-172]

37. As its stock price soared higher in the first half of 1996, due to their repeated false-favorable statements and forecasts – climbing from $18-$19 at the beginning of the year to its all-time high of $34-3/8 by 5/2/96 – Individual Defendants moved quickly to exploit this stock-price inflation by completing a huge secondary offering.

38. During the first two weeks of May 1996, Moore, D'Amico, Owen, and Bingham went to New York, Boston, Chicago, and San Francisco to meet with institutional investors, money and portfolio managers, investors, and stockbrokers to discuss PRG's

business and prospects. The purpose of the roadshow was to create strong demand for the Company's stock in the upcoming offering. They presented very positive, but misleading information, about PRG's current business condition and prospects. In particular,

- PRG's acquisition program was successful. [¶¶77-100]

- The Company was successfully integrating the acquired practices without any systems-integration difficulties. [¶¶77-100, 101-105, 126-133]

- The Company was well on its way to achieving economies of scale of operations in key markets, such as Dallas, North Texas, Houston/Galveston, Arizona, Ohio, and Las Vegas, which would lead to significant near-team cost savings in those areas. [¶¶92-94]

- PRG was forecasting EPS growth of 25%-35% over the next several years, and 1997 EPS of $1.10-$1.18. [¶¶85, 134-172]

39.     On 5/14/96, PRG completed a $5.75-million-share secondary offering at $28-1/2 per share – with 1.5 million shares sold by certain shareholders, while the Company sold 4.25 million shares – raising $115 million in needed capital.  The press release announcing this offering reiterated that PRG provides "*management expertise, marketing* [and] *information systems* ...." [¶¶77-100]

40.     The secondary-offering prospectus was reviewed and approved by Andersen before publication, and the auditor consented to the publication in the prospectus of its materially false and misleading 1995 year-end audit report. [¶¶85, 134-172]

41.     On 7/2/96, Chairman Moore announced the five acquisitions for cash and 552,812 shares of PRG's common stock: "We believe they *strengthen our current positions* in Houston, Phoenix, Kentucky, and Illinois and also represent significant first steps in the large Florida and South Texas markets." [¶¶77-83, 86-89]

42.     On 8/14/96, CEO Moore issued a release, reviewed and approved by Andersen before the publication, which reported the Company's second-quarter 1996 results and 12 more acquisitions, the total purchase price of which was $96.5 million, consisting of only $450,000 in cash and 4.4 million shares of PRG stock:

> "*This past quarter marks the end of our first full year of operations. We are excited that we continued to meet our financial objectives during this period, particularly in light of the tremendous level of operational and developmental activity.* Starting from scratch, we have grown, this first

year, from our initial 10 practices to a current level of 97 practices, including today's acquisitions...." [¶¶77-79, 80-87, 92, 101-103, 134-172]

43.     On 8/14/96, PRG, hosted by Moore, D'Amico, Owen, and Bingham held a conference call for securities analysts, money and portfolio managers, large PRG shareholders, institutional investors, brokers, and stock traders. During the call and in follow-up conversations, the four top officers continued to falsely represent that:

•   PRG's acquisition program was successful [¶¶77-100, 101-103]

•   The Company was successfully integrating the acquired practices without any systems-integration difficulties. [¶¶77-100, 126-133]

•   PRG was well on its way to achieving economies of scale of operations in key markets. [¶¶77-100]

44.     On or about 8/15/96, PRG filed its Form 10Q for the second-quarter 1996 (ending June 30). Andersen reviewed the Company's 6/30/96 financial statements, which falsely reported that the Company's financial statements were stated in accordance with GAAP. [¶¶85, 134-172]

45.     On 9/25-27/96, Moore, D'Amico, Owen, and Bingham appeared at the Smith Barney Annual Conference on Emerging Sectors in Healthcare, held in New York City, and in presentations and break-out sessions told the assorted securities analysts, money and portfolio managers, institutional investors, brokers, and stock traders present that:

•   PRG's acquisition program was successful. [¶¶77-100, 101-103]

•   The Company was successfully integrating the acquired practices without systems-integration difficulties. [¶¶77-100, 126-133]

•   PRG was well on its way to achieving economies of scale of operations in key markets. [¶¶77-100]

46.     On 10/7 and 14/96, PRG announced the acquisition of its two largest competitors, American Ophthalmic, Inc. ("AOI"), and EquiVision, the eye-care division of EquiMed, Inc., in separate transactions involving stock and cash:

> With these acquisitions, Physicians Resource Group's annual revenue run rate will increase to approximately $378 million, from a pre-acquisition rate of $248 million. In addition, with these acquisitions, PRG *will provide management services* to 136 practices, and will have 586 professionals and 44 ambulatory surgery centers, making it the nation's largest single-specialty physician practice management company. [¶¶77-79, 95-98, 123-125]

"These acquisitions are *strategically*, geographically and *financially very important* to the future of PRG," said Emmett E. Moore, Physicians Resource Group Chairman, President and Chief Executive Officer.... *Both of these acquisitions bring us significant operational infrastructure* .... [¶¶77-79, 95-98, 123-125].

47.     The market continued to be mired by defendants' false statements:

(a)     On 10/29/96, Dillon Read issued a report, written by James Lane, repeating information provided him by Moore, D'Amico, Owen, and Bingham, which forecast 1997 EPS of $1.12, and a 28% long-term growth rate for the Company, and stated:

PRG *has strong operational and financial controls in place*, but significant operating synergies have yet to be realized. *Rapid growth such as that reported by PRG requires competent management and strong internal monitoring and controls.* We have carefully reviewed with management the steps it takes in *identifying and evaluating new acquisitions and in monitoring and managing its existing businesses.* We believe that the *company does have the proper controls in place* to continue its rapid growth and *to manage its current operations*. Furthermore, PRG has plans to continue to build its infrastructure, including management and information systems.

(b)     On 11/12/96, Dillon Read issued another report, written by Lane, repeating information provided him by Moore, D'Amico, Owen, and Bingham, repeating the 10/29/96 data and comments:

We believe that the *company does have the proper financial management systems and controls in place* to continue its rapid growth and *to manage its current operations*. In addition, PRG operates a corporate data repository that currently receives information from two regional systems....

Furthermore, PRG has plans to continue to build its infrastructure, including management and information systems.... The development of these [regional Combined Business Offices] CBOs, and the addition of other administrative efficiencies, should improve operating margins, which we believe are *currently suppressed by the significant expenditure on infrastructure*.

48.     On 11/14/96, PRG issued a release, which was reviewed and approved by Andersen before publication, that reported third-quarter 1996 results, and stated:

Physicians Resource Group, Inc. today reported net revenues for the three-month period ended September 30, 1996 of approximately $60.5 million and net income of approximately $3.5 million or $0.13 per share.... Excluding the non-recurring expenses and related tax effects associated with pooling of interests transactions and including pre-acquisition income of the pooled entities, income would have been approximately $5.9 million or $0.22 per share for the three-month period. [¶¶85, 134-172]

- 18 -

* * *

Emmett E. Moore, Chairman, President and CEO stated, "This past quarter was a very significant one for PRG. We made 17 acquisitions and *met competitive pressures head-on* with the acquisition of Cincinnati Eye Institute, Houston Eye Associates and a number of practices in the Tampa, Florida area. We benefitted greatly from pooling certain of these transactions. After quarter end, we announced the acquisition of our two biggest competitors, American Ophthalmic Inc. (AOI) and the eye care division of EquiMed. *These acquisitions are strategically,* geographically and *financially important to PRG's future.* Our management team has been and will continue to be focused on closing these acquisitions and integrating their operations over the next few months. [¶¶120-124]

49. On or about 11/14/96, the Company filed its SEC Form 10Q for the third-quarter (ended 9/30/96). PRG's quarterly financial statement was reviewed and approved by Andersen before publication and the 10Q falsely reported that the 9/30/96 financial statement was stated in accordance with GAAP. [¶¶134-172]

50. Also on 11/14/96, PRG held a telephonic conference call for securities analysts, money and portfolio managers, large shareholders, institutional investors, brokers, and stock traders. During the conference call and in follow-up conversations, Moore, D'Amico, Owen, and Bingham falsely represented that:

- PRG's management expertise and experience, MIS, and accounting systems and controls permitted it to continue its growth-by-acquisition program. [¶¶101-123]

- The Company had the personnel and expertise to do the necessary due diligence on acquisitions to assure that it was acquiring only high-quality, profitable practices that met its standards and could be quickly integrated into its operations. [¶¶80-85, 109-117]

- PRG was successfully integrating the acquired practices without any systems-integration difficulties that would adversely affect its ability to continue its acquisition program. [¶¶77-100]

- The Company was well on its way to achieving economies of scale of operations in key markets. [¶¶77-100]

- PRG was still forecasting EPS growth of 25%-35% over the next several years, 1997 EPS of $1.05-$1.15, and gains in 1998 close to $1.50. [¶¶85, 134-172]

51. While PRG's stock began to decline after the 11/14/96 disclosures – from $23-3/4 on 11/14 to $17 on 12/18/96 – it continued to trade at artificially inflated levels given defendants' failure to make complete and timely disclosures of the material, non-public,

adverse facts affecting the business and financial statements, and their continuing false and misleading statements about the true extent, value, and seriousness of the problems then affecting the Company's business.

52. On 12/6/96, PRG announced it had sold $125 million in convertible subordinated debentures in a private placement, which Alex. Brown did and for which Andersen reviewed and approved the offering materials and consented to the publication of its materially false and misleading 1995 year-end audit report.

53. The market continued to be misled by Individual Defendants' misrepresentations and the Company's false financial statements.

(a) On 12/13/96, Dillon Read issued a report, authored by Lane, based on and repeating information given him in the prior few days by Moore, D'Amico, Owen, and Bingham, which forecast 1997 EPS of $1.12, and stated:

> The company's pipeline of acquisitions remains very strong and should enable the company's management to continue to grow EPS in excess of 25% throughout 1997.... With the completion of the company's recent convertible subordinated debenture offering, the company is *well-positioned to continue consolidating this industry*.

(b) On 12/16/96, Smith Barney issued a report, authored by Harris, repeating information given to him during discussions in recent days by Moore, D'Amico, Owen, and Bingham which forecast a 33% five-year EPS growth rate and 1997 EPS of $1.07.

54. On 12/22/96, PRG announced the closing of the AOI acquisition for cash and 1,323,000 shares of the Company's stock.

55. On 1/9/97, PRG announced it had acquired eight practices since December 1996 for cash and approximately 514,000 shares of its common stock, and the report quoted CEO Moore:

> PRG is the nation's *leading provider of physician practice management services* to ophthalmic and optometric practices.... PRG acquires the operating assets of these practices and *develops the practices into comprehensive eye care networks by providing management expertise, marketing* [and] *information systems* .... [¶¶77-100, 109-117, 118-120]

56.    On 2/11/97, Moore, D'Amico, Owen, and Bingham appeared at the Smith Barney Fifth Annual Health Care Services Conference, at the Plaza Hotel in New York City, and represented to institutional investors, money and portfolio managers, and brokers that:

- PRG's acquisition program was still on schedule – while there had been a Company slowdown in fourth-quarter 1996, the acquisition program would proceed on pace in 1997. [¶¶77-100]

- The Company's management expertise and experience, MIS, accounting systems and controls permitted it to continue its growth-by-acquisition program. [¶¶101-123]

- PRG had the personnel and expertise to do the necessary due diligence on acquisitions to assure that it was acquiring only high-quality, profitable practices that met its standards and could be quickly integrated into its operations. [¶¶80-85, 109-117]

- The Company was successfully integrating the acquired practices without any systems-integration difficulties that would adversely affect its ability to continue its acquisition program. [¶¶77-100]

- PRG was well on its way to achieving scale of operations in key markets, which would lead to significant near-term cost savings in those areas. [¶¶77-100]

- The Company was forecasting EPS growth of 25%-35% over the next several years, 1997 EPS of $1.05-$1.15, with gains in 1998 close to $1.50. [¶¶85, 134-138]

57.    The market, as had the acquired physicians, was deceived by Individual Defendants' false statements. On 2/12/97, Merrill Lynch issued a report, written by Wakely, repeating information provided to him by Moore, D'Amico, Owen, and Bingham, which forecast 1997 EPS of $1.09, and stated:

The shares of Physicians Resource Group have traded off recently .... After speaking with management, we believe that the weakness is not due to any change in fundamentals.

*   *   *

We talked with the company's management last night, to discuss operations and the integration of its acquisitions. *The integration of its new acquisitions is going as planned, with no unexpected problems.* However, our level of confidence in our fourth quarter and 1997 EPS estimates has increased as absolutely nothing has changed since we picked up coverage last week.

58.    On 3/26/97, PRG announced its fourth-quarter 1996 results – EPS of $.21 – and during a conference call for analysts and investors announced that, due to the recent

- 21 -

decline in its stock price, the Company would not be able to maintain its pace of acquisitions and that ongoing acquisitions would not add to its 1997 EPS, which would be lower than earlier forecast. In the following weeks, PRG admitted to analysts that instead of the growth-by-acquisition strategy it had previously pursued, it would now focus on a "same-store growth" strategy and on improving margins through operating integration and efficiencies.

59.     Individual Defendants' 3/26/97 announcement, which was reviewed and approved by Andersen before publication, did not make full disclosure of the nature and extent of the material, adverse facts affecting PRG's business and prospects. In particular, because Individual Defendants knew of, but did not disclose, the negative effect of the EquiMed acquisition on revenue and operations, and because Andersen falsely stated that it had performed an audit in accordance with GAAS, the Company's stock continued to trade at artificially inflated prices throughout the remainder of the Class Period. In fact, the stock price traded as high as $13-3/4 per share between late-March 1997 and early-November 1997, with daily trading volume averaging 234,000 shares over that period.

60.     On 5/14/97, PRG issued a press release, which was reviewed and approved by Andersen before publication, that was intended to and did understate and misreport the Company's dire financial straits:

> Our first quarter reflected an expected seasonal down-turn in earnings particularly when compared to a fourth quarter that usually has higher surgery and major medical activity. Additionally, our first quarter was negatively impacted by the lower than expected performance of the EquiMed practices which came into the company in early November 1996. *Those practices are under service agreements that are not as aligned to PRG with common production incentives as the Company's other practices* and will not fully be brought under PRG service agreements until the latter half of 1997. [¶¶134-172]

*   *   *

> Additionally, a substantial number of the EquiMed practices were managed through billing and invoicing systems that were kept intact through April of 1997, thus, certain corporate synergistic benefits from combining EquiMed with PRG have not yet been accomplished and will not be accomplished until the latter half of 1997. *However, we expect those practices when transitioned to achieve stabilized operations and a growing contribution to PRG. They*

- 22 -

*are practices that are strategically very important to PRG's other practices and markets.* [¶¶134-172]

\* \* \*

PRG has established itself as a *clear leader in the delivery of comprehensive eye care in substantially all the markets we currently operate*, approximately 15 major metropolitan markets and 30 secondary and rural markets in 24 states, many of which are contiguous state and regional areas and most of which have little organized competition. *We are focusing a greater percent of our efforts on market integration and the achievement of more efficient operations in each of these markets which will take time and investment.* This shift of focus is reflected in our first quarter results, particularly with respect to the addition of the two large groups of practices acquired in the American Ophthalmic and EquiMed transactions completed in the growth quarter of 1996. [¶¶134-172]

61.     On 5/21/97, EquiMed announced via *PR Newswire* that it had filed a claim before the American Arbitration Association to enforce certain terms of its October 1996 Asset-Purchase Agreement with PRG and to recover damages in excess of $30 million.

62.     On 6/17/97, PRG issued a press release announcing that it had asserted counterclaims in the arbitration in connection with the Company's purchase of eye-care practices from EquiMed, including breach of representations and warranties, fraud and conversion.

63.     Consequently, at least by the time of the 6/17 announcement, Individual Defendants knew that the EquiMed eye-care practices were overvalued on PRG's books and that the Company would be forced to make accounting adjustments. Thus, they failed in their continuing duty to disclose all material, non-public, adverse information about the value of the practices acquired from EquiMed. *See also* [¶¶134-172]

64.     In "*F.Y. Eye*", the Company newsletter, published August 1997 [Vol. 3, Issue 5 at page 2], Owen made clear his role in making public statements, the irony of which – denoted in bold – is second only to his perpetuation of the myth of integrated practices and same-store-sales growth. PRG's newly promoted president wrote the following "Point of View" column:

In my former role as CFO and now current role as President, I've probably had more exposure to our investors (both institutional and individual) and to the investment banking firm research analysts that follow our company than anybody else in PRG. These two constituencies, along

- 23 -



with various brokers and the financial press are what we affectionately refer to as "the street" and are the primary forces behind what drives our stock price. I have frequently been asked, particularly during the past several weeks, about what "the street" is telling me regarding *what it will take to get our stock price moving again. The plain and simple answer, which so happens to be the focus of this month's edition of F.Y. Eye, is market integration and same store sales.*

It is not that acquisitions aren't important. They are strategically *very important* and continue to be needed to support our integration strategy and profitability. However, what "the street" is telling me that *we need to demonstrate that our business plan (i.e. market integration) is working and that it will become the future driving force behind the earnings and profits of the company. If this in fact happens, the stock price will begin to move.*

*Wall Street is littered with the corpses of too many roll-up companies that were nothing more than acquisition schemes that never became operating entities. Market integration is the key to our well being. Let's make it happen together.*

65.     On 8/13/97, PRG filed its Form 10Q for its second quarter (ended June 30), which repeated earlier statements about its counterclaims against EquiMed for damages in excess of $45 million. The Company's second-quarter financial statements and Form 10Q were reviewed and approved by Andersen before publication and filing with the SEC. [¶¶134-172]

66.     On 9/4/97, PRG issued a press release announcing that it had hired Goldman, Sachs & Co. and Smith Barney Inc. to study a possible sale of the Company. As a result of this announcement, PRG's stock price rose in the following weeks to $11-1/8 on September 26, 1997.

67.     On 11/19/97, PRG shocked the market by revealing that it would suffer a *huge loss* in third-quarter 1997 of $18.4 million, or $.62 per share. The Company also revealed for the first time that it would take a one-time charge of $31.75 million for "asset-valuation losses" ($27.8 million from future practice closings and $4 million to establish reserves on accounts receivable). But for these charges, PRG's operating income would still have been $.11 per share.

68.     Also on 11/19/97, PRG announced the termination of Chairman and CEO Moore, that it would no longer pursue a sale or strategic merger, and that it would not buy any more practices.

69.   The following morning, on 11/20/97, *The Wall Street Journal* reported that PRG had admitted that the charges that it was taking – $3.75 million – stemmed primarily from practices it acquired one year earlier from EquiMed and that EquiMed had overstated their value.  Defendants obviously knew on 6/17/97 at the latest that EquiMed's assets were overvalued and impaired, when PRG filed its counterclaims, in which the Company claimed it was entitled to an offset with respect to monies owed to EquiMed.  PRG's stock price ultimately collapsed to as low as $2-5/8 per share – 93% below its $34-3/8 per share Class-Period high.

70.   In late-November 1997, one week after the Class Period, during a meeting in Tampa, with 11 PRG doctors, including Dr. Hauber and his representatives, and four corporate executives, General Counsel Corporate Secretary, and Chief Administrative Officer D'Amico made a number of admissions demonstrating that defendants' statements during the Class Period had been false, including:

- The Company admitted that it had internal-control weaknesses in its accounting system and that it could not run a public company in such a fashion.  As a result, PRG's 10Qs were not reliable.

- PRG's business model was flawed.  The PRG concept does not work: acquired practices had diminishing bottom lines, while practices not acquired by PRG had increased their bottom lines, thus the acquired practices were less profitable than they had been in the past.

- The Company's corporate infrastructure had burdened the acquired practices with poor financial structures, had forced practices mergers that were not practical, did not account for the geographical needs and trends, and PRG had acquired too many practices to manage.

- PRG could not add more practices because the infrastructure was not in place to service them.  In fact, the Company had did not have enough personnel to service its 150 acquired practices.

- PRG's lacked the necessary systems to convert the cash-basis accounting used by local practices into accrual accounting needed for PRG's financial statements.

- The Company's accounting department was discontented, turnover was high, and it lacked the necessary accounting infrastructure.

- PRG, in actuality, had become an accounting company, but it did not know how to do accounting.  It had numerous mistakes on its payroll and benefits plan, and the Company had grown from 200 to 6,000 employees within 12

months without the infrastructure or the accounting system necessary to handle this explosive growth.

- PRG had done too many deals too quickly and it had too many practices.

- Integration of its practices had not occurred.

- The acquired practices and the Company had been in chronic disputes over included and excluded expenses, its financial statements were inaccurate, and its business model had failed.

- In fact, PRG's business model had demolished the entrepreneurial spirit of the individual doctors in the practices, created a lack of synergy, and the practices had decreases in revenue with PRG in place, rather than increases in revenue, as they had historically. Indeed, the corporate culture imposed on the individual practices had made for disincentives for practice growth.

71.     In an article published in the December 1997 *Review Of Ophthalmology*, PRG Board member and physician Joseph Noreika admitted, "*The essential systems that were lacking were the financial systems*," and Board member David Schulman conceded, "*In particular, the acquisition of Equimed and AOI outstripped our ability to provide resources at an adequate level*" – "*[o]ur reach exceeded our grasp*." Standard & Poor's lowered its rating on the Company's debt for a second time to even lower "junk" levels, saying that "after consummating a series of acquisitions, PRG had difficulty in integrating and controlling operations," stressing its "*inability to adequately track and recoup accounts receivable from affiliated practices*."

72.     In mid-January 1998 – just eight weeks after the truth was revealed – Peter G. Dorflinger was named President and Chief Operating Officer. While the Company searched for a new CFO, and acquisition negotiator Mark Kingston "elected to explore opportunities outside PRG," Dorflinger sent a January 30, 1998 memo to all PRG employees that was candid in explaining why "[t]he wheels came off the track recently." As to "What Happened?" – in contrast to Individual Defendants' representations during the Class Period, Dorflinger reported:

- "The Company completed a staggering number of practice acquisitions during the past two years .... Unfortunately, the growth overwhelmed the Company's infrastructure."

- "As a consequence, the Company forced services on our practices that were not cost effective."

- 26 -

- "Furthermore, our regional accounting and cash management systems have been riddled with problems that have consumed management time and resources in a fire fighting mode for months. The acquisition screening process was too lax. We acquired some very marginal practices that we must now dispose of or integrate into more successful operations."

Dorflinger reported that "[a]s a consequence of unbridled growth through acquisition .... Our customers (our practices, in case anyone has forgotten) are unhappy with us and some view us adversaries. Acquisitions are on hold." Dorflinger also reported that "The Outlook" included "introducing a new business model to the practices" and "we must regain the credibility of our practices ...."

73.     Nearly a year later, on 11/13/98, PRG announced that it would not file its third-quarter report on Form 10Q (for the quarter ended 9/30/98) on a timely basis as a result of problems with the Company's internal-controls and financial- reporting systems; lack of adequate financial information from certain affiliated practices, which were in dispute with the Company with respect to the contracts with PRG; and the unwillingness of Arthur Andersen to assist the Company.

74.     The Company also announced that Andersen had resigned as the Company's independent public accountants. The principal reasons for its resignation, as expressed to the Company, were its concerns about whether there existed internal financial controls and adequate financial reporting from affiliated practices necessary for the Company to develop reliable financial statements, and its belief that the Company's prior management had not taken steps to remedy problems disclosed to it by Andersen in a "material-weakness" letter delivered in connection with the auditor's issuance of its opinion with respect to the Company's financial statements for the year ended 12/31/97, as disclosed in its Form 10-K for that period.

75.     On February 1, 2000, the Company declared bankruptcy.

### WHY INDIVIDUAL DEFENDANTS' STATEMENTS DURING THE CLASS PERIOD WERE FALSE AND MISLEADING WHEN MADE

76.     The positive statements made by the Company and Individual Defendants during the Class Period about PRG's business and operations, its acquisitions and their

effect upon the Company's business and EPS prospects, and the reliability and accuracy of its financial statements, were each known to be or were recklessly disregarded by them as being false and misleading when made.   Given PRG's business purpose and reason for existence, the combined effect of their statements, and the certification of the Company's financial statements by Andersen, created the materially false impression that PRG had the financial foundation, required resources, and infrastructure to integrate and manage  its acquired practices, and further created the materially false illusion that PRG, led by Individual Defendants, had, in fact, successfully integrated its acquired practices.  The true facts, which they knew, but were intentionally or recklessly concealed, and which were "red flags" to Andersen as a result of its audit and reviews, its consulting services about PRG's internal-control and management-information systems, and its review of its prospectuses and other SEC filings – disclosure of which was necessary to make the statements not misleading – are set out below.

### Individual Defendants Failed to Deliver the Promised Management Expertise and Infrastructure to Enable its Doctors to Achieve Economies of Scale

77.     The "R" in PRG – Resource – particularly with the advent of EquiVision and AOI – purportedly represented not only the capacity to assimilate scores of practices and hundreds of new employees, but also the capacity to streamline the individual practices by offering assistance to doctors to make their practices more profitable by seeing more patients and improving their business. In reality, the problems with untimely and inaccurate financial data, the absence of a computer network, product-coding problems, and the utter failure to provide promised resources to train, educate and assist the acquired practices were never resolved.

78.     The Company acquired ten practices in February 1996, fifty Eye Corp. practices in March 1996, eight practices in April, 1996, two practices in June, 1996, six practices in July, 1996, seven practices in August, 1996, and EquiVision in October, 1996, plus forty other practices in that same month. Despite this explosive growth – 87 practices *plus* the AOI and EquiVision chains – *the Company failed – beginning with the June 1995*

*IPO – to invest in any infrastructure to integrate* affiliated practices or to make any substantial effort to *manage* the practices or to provide the management services and economies of scale that Individual Defendants had promised, which was *the* selling point for *each* acquisition.

79.     Contrary to its representations of a strong and experienced management team, PRG lacked the leadership to integrate the large number of acquisitions it was pursuing and manage the expanding business. In fact, Moore, Owen, and Bingham – former Andersen personnel – had neither implemented an acquisition program as expansive as PRG's, nor had they successfully managed a business enterprise as large as the Company would be after the EyeCorp, AOI, and EquiMed acquisitions – growing from 200 to 6,000 employees in 12 months, and acquiring over 100 practices in two years.

**Bingham, D'Amico, Moore, and Owen Knew that the Company Lacked the Promised Infrastructure and Management Expertise, and Could Not Integrate the Acquired Practices Throughout the Class Period Because the Company's Vice President of Operations Repeatedly Informed Them of These Deficencies.**

80.     Bill Chow managed Inland Eye Institute, a 23-doctor practice at seven locations in California and Nevada, one of the first large PRG purchases. Chow attended meetings in April to June 1995 (before PRG's IPO) with Steve Harter, a former Andersen employee who had an expertise in consolidation rollups, and Mark Kingston, the Chief Development Officer and later (as of January 1, 1996) Senior VP. These meetings, held in Dallas with other PRG founders, were utilized by the Company's executive committee to, among other things, perform due diligence for practices in the western region as part of PRG's acquisition, due-diligence, and operations teams. When PRG went public by July 1995, Chow was VP of operations with multiple responsibilities, including advising Dan Chambers, Sr. VP for Operations, Kingston, and Emmett Moore, first as President and director in the June 1995 IPO and later as CEO and chairman, about the necessity to develop new managed-care contracts for PRG practices. In fact, Richard D'Amico (PRG's general counsel) and Kingston told Chow that PRG wanted to use his name in its IPO

- 29 -

Prospectus to emphasize the Company's management expertise. But Chow, based on his communications with Moore, D'Amico, and Owen, knew that PRG *neither had the infrastructure in place nor the experienced practice-management talent* to effectively operate as a practice-management company. Chow states that PRG was never a *practice-management* company, as represented from the June 1995 IPO forward, but simply a *practice-acquisition* company.

81.     Indeed, Chow warned the Inland Eye board members that PRG offered them an exit strategy – at a time when there might not be another available in the face of managed-care – but the Company did not have any management talent or infrastructure in place to make it happen. Chow told them that PRG's attempt to manage its acquired practices would be like "trying to herd rats."

82.     Chow, as Operations VP, attended weekly conference calls hosted by Dan Chambers and attended by Bingham, D'Amico, and Owen regularly, and by Moore on occasion. Throughout 1996 and 1997 doctors raised specific complaints and conflicts between regional management and the practices as a result of PRG's inability to produce financial statements and integrate business operations. Moreover, from April 1996 forward, Chow recalls regular reports given by regional managers detailing PRG's inability to deliver on its basic promises, especially accounting operations. Throughout this time, Chambers told the western region practices that PRG *needed* to construct infrastructure and address the growing physician complaints, but he could not get Moore, Owen, Bingham, and D'Amico to focus on Company operations because they were solely focused on acquisitions.

83.     Chow also worked on PRG's operations, due-diligence, and acquisition teams, and knew that the Company did not have the infrastructure to manage practices, a failing that he expressed to D'Amico, Owen, and Bingham at numerous times through the IPO and in the months following throughout 1996. His message to them was that it was unwise to buy practices just because doctors were interested in an exit strategy, and that *the Company had no strategic plan to integrate competing practices*, which he knew

- 30 -

would not make good partners and deliver the synergy Individual Defendants had promised. Chow saw that their approach was simply first and always acquisitions. Moreover, he saw firsthand that the original 10 founding practices were all successful *before* PRG. Thus the *only* integration for them was that the Company assumed payroll responsibilities while systems integration, including accounting and reporting, was non-existent.

84.     Chow was part of Dan Chambers's due-diligence efforts for the EquiVision purchase – some 40 practices in various parts of the country – and was assigned to "kick the tires" of three practices in California (Sacramento, Redding, and Stockton) and report informally about their operations viability.   Other members of the operations and acquisitions team included Dawn Cavanaugh, in the Midwest and southern states, and Mark Kingston for practices in the east, among others.   Chow interviewed doctors at the three EquiVision practices, reviewed their general financial performance and the EquiVision physician agreements, and quickly concluded that not only were the practices in exceedingly poor financial shape, but so was the parent company.   Doctors complained that EquiVision was paying bills slowly, if at all, and that the EquiVision model was fundamentally flawed – the acquisition of a practice did not require the original owner/doctor to continue working with EquiVision for any substantial length of time. When his assignment was completed, Chow faxed his handwritten report to Chambers, in which he explained, as he did in follow-up conversations with Chambers and D'Amico, that PRG should discontinue any consideration of acquiring EquiVision.   Chow's conclusion, echoed by Cavanaugh and Kingston, was that younger EquiVision doctors were angry because they inherited a liability without any means of owning an asset, where both their practices and the parent company were financially unstable.   In fact, Chow knew of no member of the PRG operations and due-diligence teams who made any positive recommendation about the EquiVision acquisition.   And when Chow asked Chambers why the executive committee decided to go through with the EquiVision deal, Chambers responded, *"Emmett wanted it done."*

85.     Dawn Cavanaugh, midwest region director, visited some eight EquiVision practices after acquisition in response to assignments from Dan Chambers, and found these practices to be "the bottom of the barrel" in terms of both physical and financial condition. Chambers assigned Cavanaugh the EquiVision practice reviews soon after their acquisition because PRG was not receiving management-fee payments and EquiVision doctors were complaining "that there was no way they could afford to make the payments." At each EquiVision practice, she reviewed the PRG acquisition agreement and the practice's financial information, from which, *in every case,* the amount of management fees that PRG anticipated per practice was far greater than what the practices were able to produce. For example, some were projected by PRG to produce as much as $500,000 per year in management fees, but the total profit for the year before the acquisition was only in the $200,000-$300,000 range. Cavanaugh's reviews showed that the *actual* financial condition for EquiVision practices was *overstated* in PRG's revenue projections *by as much as 100%* or more, and each practice reviewed had multiple side agreements with PRG that were executed on or near the acquisition date, which included guaranteed salaries for doctors and debt forgiveness for prior loans made by EquiVision to the practices without any reference to them in the PRG acquisition agreement, all of which Cavanaugh described in detail in the report she submitted to Dan Chambers.

**Bingham, D'Amico, Owen, and Moore Knew that the
Company Lacked the Promised Infrastructure and Management
Expertise, and Could Not Integrate the Acquired Practices
Throughout the Class Period Because a Board Member
and Founding Physician of the Company Repeatedly
Informed Them of These Deficiencies**

86.     Dr. Kenneth Westfield, a PRG founding physician and board member, worked closely with CFO Owen and General Counsel D'Amico, as well as Chief Development Officer Kingston, when the original 10 practices were acquired. All 10 founding practices were promised that the Company would manage the practices and grow the revenue. But early on, Dr. Westfield and other physician-board members recognized that the Company violated its own original bylaws, which provided that, for

any acquisition of a practice where a previously acquired practice existed, the newer acquisition was required to be consolidated with the existing practice – rolled up – to eliminate competing PRG practices in the same market. Dr. Westfield describes the PRG model sold to the 10 founding practices by Moore and Owen as a roll-up of competing practices as acquisitions were made, otherwise the newer acquisitions in a competitive market would represent a significant disadvantage to existing practices. Nevertheless, the Company emerged from its IPO on an acquisition binge, without any concern for or focus on roll-ups. It was management's view that it would simply take too much time to negotiate consolidations as a prerequisite to acquisition. In particular, CEO Moore emerged quickly after the June 1995 IPO as a champion of accelerated acquisitions while ignoring physician concerns over a lack of practice-management expertise and infrastructure.

87.     During fourth-quarter 1995 and throughout 1996, Dr. Westfield repeatedly urged Moore, Bingham, Owen, and D'Amico to consider PRG's promised economies of scale for acquired practices, which had been one of Moore's consistent sales pitches pre-acquisition. Dr. Westfield knew synergy would never be realized by the Company or the practices if consolidation of practices after purchase never occurred – and without a roll-up strategy there was no basis to project cost savings or increased profits. Consequently, Dr. Westfield expressed to the Company's executive committee, including Individual Defendants, in fourth-quarter 1995 and throughout 1996, that PRG could *not* add value to existing practices without consolidation in comparative markets.

88.     It was clear to Dr. Westfield, as a founding board member with regular contact with other board members and physicians who gathered for PRG conferences, that "right from the beginning" virtually every acquired practice experienced the same problems resulting from the failed promises about existing accounting integration and infrastructure that never materialized. No PRG practices were ever integrated for accounting purposes and none were ever "managed" by PRG's "management expertise," which was contrary to Moore's public statements and private promises. Dr. Westfield

- 33 -

knew of no activities by PRG – marketing, practice consolidations, accounting integration or infrastructure – to increase same-store sales or to add value to acquired practices, and the Company never exhibited any plan to execute on Individual Defendants' representations.  At most, Dr. Westfield recalls PRG hired an outside consulting firm to audit the Company and make recommendations – one of which he recalls being to fire Emmett Moore – but no benefit for the practices was ever delivered.  Indeed, in Fall 1997, when the board became convinced it had been misled by Moore based on the Company's lack of infrastructure and failure to take any corrective action, coupled with a continuing stock-price decline, one of six recommendations from an outside audit of PRG's accounting and operations to turn the Company around was specifically to fire Emmett Moore.

89.    Dr. Westfield, as a founding board member, had a direct relationship with Chairman Moore, speaking to him 10-15 times a year from 1995 to 1997.  During those conversations, they discussed the broad spectrum of PRG-related problems that Westfield experienced in his own practice and, as the Company continued making acquisitions, experiences communicated to him from practices nationwide.  Echoing physician sentiment that the PRG-generated financial statements were untimely, if ever delivered, and when they were delivered, they were incomprehensible and inaccurate, Dr. Westfield complained *directly to Moore* that PRG's financial reports "didn't make any sense." At one point Dr. Westfield calculated his net profit as "about zero" after deducting a 50% draw for 1996 – the same calculation PRG made for Dr. Shepherd in Las Vegas.  Universally, acquired physicians repeatedly complained that, far from improving same-store sales and increasing profits, acquired practices had performed far better pre-acquisition in terms of earnings and growth than after.  Dr. Westfield's practice suffered a 30-35% drop in overall profitability post-acquisition, and the Company's failure to integrate groups of practices was a principal reason why the promised economies of scale were never realized and same-store profit declined.

90.    PRG's acquisition committee, which included Dr. Westfield as a founding board member, was not involved in negotiating for EquiVision, a deal that was handled

by Moore personally, assisted by Bingham, D'Amico, and Owen. Following the October 1996 acquisition, coupled with a stock-price decline and the continuing decline in same-store sales, board members, including Westfield and Joseph Norieka, a PRG physician from Cleveland, believed that the EquiVision acquisition revealed to Wall Street that PRG was growing by acquisition only, "adding layer upon layer of administration," as Westfield described it, without ever intending to integrate the accounting or provide the infrastructure that was crucial.

91.     In fact, during discussions about PRG's countersuit against EquiVision in June 1997, Dr. Westfield recalls that Chairman Moore explained that members of the due-diligence team expressed "some concerns" about EquiVision, but Moore and the executives concluded that PRG should go ahead because the acquisition would be good for the Company, and that any problems with the acquisition were caused by misrepresentations made by EquiVision during negotiations.

**Bingham and Moore Knew That the Company Lacked the
Promised Infrastructure and Management Expertise Throughout
the Class Period Because Two Physician-Directors Repeatedly
Informed Them of These Deficiencies.**

92.     In exchange for 35% of physicians' profits after expenses, PRG promised to provide integrated and efficient accounting and management expertise, including telling Drs. Soper and Shepherd of Las Vegas, at an August 1995 presentation in Sun Valley and in many conversations thereafter, that the Company would recruit expert business managers and physicians when needed in growing practices in a campaign to bring "economies of scale" through efficiency, increased profit margins, and practice growth. But Drs. Shepherd and Soper noticed immediately after their acquisition that PRG was unable to provide timely accounting data, if at all, and that financial statements, when received, were several months late and the data woefully inaccurate. In fact, pre-acquisition, Moore and Chambers represented to Drs. Shepherd and Soper that PRG would computerize business operations and accounting for acquired practices and "tie them up" in an integrated system – but PRG had no such system and never developed one. The two Las

- 35 -

Vegas physicians knew that ophthalmology practices operate on a cash basis, but PRG utilized a Dunn & Bradstreet software program based on accrual accounting for public reporting, and thereby the Company was unable to integrate the cash-based reporting from the practices. And when Dr. Soper raised this deficiency during weekly phone conversations with Chambers, beginning in March 1996 through the end of the Class Period, Chambers typically responded: "We're working on it." Moreover, no physicians were ever recruited for their practices.

93. Dr. Soper participated in PRG's weekly Monday-afternoon conference calls for all regional managers, beginning for Soper in April 1996, which were periodically attended by Moore and Bingham, and the emphasis was always on acquisitions. Missing were any answers to physician complaints, fielded by the regional managers, and repeatedly addressed to Chambers and other members of management in the calls and in private conversations by Drs. Soper and Shepherd and others.

94. Drs. Soper and Shepherd of Las Vegas saw firsthand the falsity in PRG's promised management expertise. Not only did the Company fail to provide the pre-IPO practice-management talent promised, but when it did get involved the results were disastrous. When the Company purchased Westfield Eye Clinic, a founding practice, with it came a substantial Nevada contract with Sierra Health Services. In 1997, that contract came up for renegotiation, and PRG's consultant, John Pinto, represented by the Company to be an expert in managed-care contracts, was dispatched to renegotiate, along with Operations VP Bill Chow, who later reported to Drs. Soper and Shepherd that Pinto's performance resulted in the contract being lost overnight, which virtually destroyed Westfield's practice and caused his ambulatory surgical center to fold – *a major PRG asset that was gone in a year because the Company did not have practice-management expertise*.

**Bingham, Moore, Owen & D'Amico Knew that the Company**
**Lacked the Promised Expertise Throughout the Class Period**
**Because the Company's Own Employees and Executives Were Acutely**
**Aware of, and Encountering Repeatedly, the Deficiencies Resulting**
**From Defendants' Lack of Proper Systems**

95.    Mike Grubbe, an AOI VP, was a PRG regional operations director post-acquisition in October 1996, responsible for the existing AOI practices in Florida.  Post-acquisition, the existing agreements between AOI and its practices remained intact with PRG, and the Company operated AOI through a regional office in Orlando.  It appeared to Grubbe that PRG, before October 1996 and thereafter, did not have the manpower or infrastructure to execute on its business model – which was one selling point for the AOI acquisition.  For example, no one from the Company showed up at the regional office for nearly a month after the AOI acquisition.  Even then, the PRG representative was there only long enough to announce who at AOI was being let go, who was being retained, and for how long.

96.    Additionally, Grubbe reports that PRG failed to dispatch operations personnel to newly acquired AOI practices to convert them to the Company's format.  Pre-PRG-acquisition, Grubbe performed these conversions for AOI practices, *immediately* setting up bank accounts, operations systems and accounting functions to ensure a thorough conversion.  But post-PRG-acquisition, even though Grubbe was a regional operations director, he was not included in regular management conference calls or meetings, and PRG treated the remaining AOI managers "like red-headed step-children," while AOI physicians questioned what they were supposed to do, without any idea where to begin.

97.    Wendy Profitt, an AOI employee since mid-1994, was the director of practice development post-acquisition who reported directly to Cay Carner, PRG's vice president of practice development and head of its in-house consulting services.  Ms. Carner officed with the Individual Defendants in Dallas and was their spokesperson.  Profitt, based in Winter Park, Florida, trained employees of newly-acquired practices on how to treat potential patients to "get them in the door."  She saw firsthand that the "biggest service"

that PRG offered practices for marketing and development – and the only one – was a national Yellow Pages™ placement agency, which saved practices about 15% on ads. Profitt explained that she and her boss comprised the entire practice-development organization: "If you just do the math, that's two people to service 150 practices at one time." According to a former PRG doctor, Carner's main pitch to help doctors get the benefit of the Company's promised services and management was, in essence, "work together to do it yourselves." Carner explained to her staff-of-one – Wendy Profitt – that doctors were dependent upon their own practices – PRG's goal was to grow those practices enough to sustain the addition of new physicians recruited by PRG, who would continue to pay the Company's 35% fee after the existing owner-doctors retired or quit.

98. After PRG acquired AOI in October 1996, Profitt learned that the Company had promised recruiting services to bring physicians into existing practices to grow those businesses, which she knew was a primary acquisition enticement from PRG. When she questioned how the Company would supply the various resources necessary to fulfill its promises – standardized business operations, marketing, physician recruitment and patient growth – she learned that PRG's approach was just to continue growing by acquisitions, all the while doing nothing to keep the promises made to acquired physicians.

99. Mark Kingston, PRG's executive VP of Mergers and Acquisitions, identified the major players in the acquisition process as CEO Moore, CFO Owen, General Counsel D'Amico, Andersen and outside and inside legal counsel, but that the Company's final decision to acquire a practice was Moore's. Kingston states that it was PRG's intention to grow by acquisition, but the Company encountered problems resulting from rapid acquisition growth because all three distinct phases – integration, absorption, and management – demanded completion, but were never done, and that a major problem was encountered because *adequate systems to manage the practices were not in place*. Simply stated, infrastructure was missing in action.

100. Kingston agrees that the Company "had no linkage between the cash accounting and the accrual accounting," a problem exacerbated because there were some

hiring Baldwin, there was little, if any, effort made by PRG to solve the persistent problems, which was hard to do with only one person assigned that task.

103.    Because the accounting trouble started from the day after the IPO, Chow recounts that by mid-1996 the situation was so critical that Dan Chambers brought in consultants to work with PRG's Dunn & Bradstreet software system.  As Chambers explained during weekly conference calls, the consultants were trying to integrate cash-based information and perform dual accrual/cash reporting formats, a capability that PRG had consistently represented already existed when practices were acquired, *but the consulting project resolved nothing*.  At the same time, because several PRG board members were physicians from acquired practices, Chairman Moore could not escape hearing first hand about their experiences repeatedly at board meetings.

**Bingham, D'Amico, Moore, and Owen Knew Throughout
the Class Period that the Company Failed to Deliver
the Promised Uniform Accounting Systems Because Two
Physicians Repeatedly Informed Them of This Deficiency**

104.    While the Company ostensibly required "flash" statements from doctors' offices for quarterly financial reporting – quick-look sheets to show how many patients had been seen each month, revenue derived from those visits, and associated costs – Dr. Leslie Soper and Dr. Ken Westfield learned from conversations with management, including Moore and Chambers, that most practices were *not* providing flash statements which, for Dr. Soper, begged the question: *how could PRG accurately report its financial condition?*

105.    Dr. Soper in Las Vegas worked closely with Chow.  Both had regular contact with PRG's corporate representative, Dan Chambers, and regular conversations with D'Amico and Owen to discuss PRG's ongoing failure to provide any accurate accounting and infrastructure.  As a result, as a way to simplify the operations, Dr. Soper, without PRG's assistance, set up a combined-business office – CBO – to attempt to integrate the accounting and billing for several practices and to then send a unified report to PRG.  By his own initiative, Dr. Soper created economies of scale by integrating local practices, including centralized accounting, through a small but unified computer facility linking

- 40 -

various practices, a training school and a purchasing system – precisely what PRG promised it already had pre-IPO. Even so, PRG was *never* able to return an accurate or understandable financial statement for the Las Vegas practices. PRG's response? Simply that Drs. Soper and Shepherd and others involved with practice accounting did not understand PRG's accrual method, *even though management had promised in the acquisition phase that PRG's accounting system could integrate cash reporting and convert – flip – to the accrual method for getting financial statements back to the practices.*

106.    Drs. Soper and Shepherd met with CFO Bingham in June 1997 at the Shepherd Eye Clinic in Las Vegas, and reported to him that PRG's failure to integrate or manage the acquired practices left them in a state of disarray, particularly their accounting. Bingham was accompanied by an accounting consultant, whose initial assessment of the accounting operations set up by Dr. Soper at the Las Vegas CBO was that all he'd done was "put together a bunch of bookkeepers," when what was needed was an accountant. Thereafter, PRG recruited Sue Takahashi, but she proved soon to be so incompetent and unable to understand the Vegas operations that it was impossible for her to assist in the accounting integrations with PRG operations. Aside from Bill Chow, who came to PRG with one of the founding practices, Takahashi was the *only* PRG "manager" in any sense who was purportedly installed to perform accounting-functions integration *and she was gone within 90 days.* This was in direct contradiction to what Emmett Moore told Drs. Soper and Shepherd and the other August 1995 Sun Valley attendees, and in subsequent conversations with Moore, Chambers, and Bingham, who had represented that PRG would provide expert accounting and financial management and provide practices with monthly and quarterly reporting to demonstrate with financial data that the PRG economy-of-scale model made a profitable difference. The model failed for lack of any effort to make it a reality.

107.    Dr. Shepherd attended a meeting in Los Colinas during first-quarter 1997 for all PRG practices. Representatives of over 150 practices heard CEO Moore acknowledge

- 41 -

their complaints and dissatisfaction over PRG's failure to deliver accurate accounting statements. Moore's only response was that the Company was finalizing the raising of additional capital through a convertible-bond offering. At approximately the same time, Dr. Shepherd knew that Moore, Chambers, Bingham, Owen and D'Amico made representations to Wall Street that PRG *had successfully integrated* the acquired practices' accounting and operations. But Shepherd and the other physicians from acquired practices knew this was false, even when Moore stated that, with the new capital infusion, PRG would be working hard to fix the problems and purchasing new computer systems and thereafter integrating them, and soon the various problems would be resolved with physicians realizing increasing profits within two to three years as promised because of the PRG "economy-of-scale" model. But the physicians never saw any effort to resolve the problems or increased profits.

**D'Amico, Moore, and Owen Knew Throughout the
Class Period that the Company Failed to Deliver
the Promised Uniform Accounting Systems Because
a Board Member and Founding Physician Repeatedly
Informed Them of This Deficiency**

108. Dr. Ken Westfield, a PRG physician board member, saw firsthand how PRG's lack of accounting systems virtually crippled financial reporting of the acquired practices, a view he expressed in board meetings throughout 1996 and 1997, joined by other director physicians from their own experiences. There was consensus that any attempt to get accurate financial information from PRG took months, and when and if it arrived, it was nonsensical. Moore, D'Amico, and Owen consistently assured physicians, including board members, that PRG was "working on it," and that more accounting personnel were being hired to integrate the practices and solve the problems. Moore often discounted the physicians' concerns, often responding to Dr. Westfield's issues with "not again, Ken," and "Ken, that's the same old stuff." The physicians' concerns about the lack of accounting and infrastructure were discussed by the entire board and the executive committee throughout the class period during board meetings held at the DFW Hyatt. These meetings, lasting up to five hours and almost always with full attendance, focused on complaints directed at

- 42 -

Moore that PRG had *never produced a single accurate financial statement to any doctor at any time because it was incapable of doing so.* Moore's consistent response was only to assure the board that PRG "would get a consultant on the problem," that CFO "Rick Owen would look into it," or that Owen would "get somebody out to that practice."

**D'Amico, Moore, Owen, and Bingham Knew Throughout the Class Period that the Company Failed to Deliver the Promised Uniform Accounting Systems Because a Regional Director Repeatedly Informed Them of This Deficiency**

109. Dawn Cavanaugh, a PRG employee from November 1996 to Fall 1999, and a regional director by the end of the Class Period, traveled to various acquired practices as a "troubleshooter" or "turnaround artist" based on her experience with the eye-care business for several years before joining PRG. She reported to CAO Bingham at times, and had frequent communication with general counsel D'Amico and, on a few occasions, with CFO Owen. Shortly after joining PRG, Ms. Cavanaugh recognized the consistent difference between the *actual* financial conditions at PRG practices when compared to the Company's financial statements prepared for those practices as a part of its corporate financial reporting. Cavanaugh reviewed financial data for some 50 PRG practices from late-1996 through early-November 1997, the end of the Class Period, and visited many of those practices, all of which demonstrated a consistent and substantial overstatement in PRG's reporting for individual practices based on management-fee revenue. In fact, the actual financial performance and business condition of the practices she visited and reviewed showed far less net profits than what PRG projected when it forecast its own 35% management fee from which the Company derived its sole revenue source.

110. Cavanaugh recognized two reasons for this discrepancy. *First,* by using the accrual method for accounting and financial reporting, PRG booked revenue based on *projected* management fees that were calculated from the terms of the acquisition agreements with individual practices, and *not* on actual performance thereafter. That is, when PRG consummated an acquisition, it paid a multiple of annualized revenue for each practice or group in the form of a lump-sum down payment in cash, with the balance in

stock. The Company then used the annualized revenue calculations from the acquisition agreement to project profits from the acquired practice for the remainder of the current year, Cavanaugh states, and at least the next year as well. PRG then booked revenue from its management-service contracts executed at the time of the acquisition by accruing management fees based on those projections and *not* by actual fees received or from actual accounts-receivables based on actual revenue. *Second*, as the basis for its quarterly reports, the regional director knew that PRG then prepared financial statements for each practice reflecting the Company's management fees, which were calculated from the annualized revenue amount and projected profits used to fix purchase prices for acquisition, plus an added growth factor. But the regional director knew that the scores of practices she reviewed were not actually producing the projected revenues or net profits – in fact, most were declining in overall revenue and profits rather than growing.

111. Cavanaugh understood from communications with Company finance personnel that PRG used its own financial statements prepared for the individual practices as the basis for its financial reporting during the Class Period. For example, Dan Chambers contacted Cavanaugh in late-1996 and assigned her to review and visit the Fritch Eyecare Center in Fresno, CA, owned by Dr. Charles D. Fritch, one of the 10 founding-practice members and a director. PRG was "having trouble with Dr. Fritch," who was complaining about how high PRG was contending his management fees should be and also making the "standard complaints" about the Company's lack of accounting capability and accuracy. Based on Cavanaugh's financial and operations review, the Fritch practice, like most she visited, had its own software system, which it used to run the business and perform accounting functions. For 1996 Fritch was forecasting an approximate $200,000 loss as a result of declining Medicare reimbursement, which had a negative effect on per-patient charges and aging receivables. The review showed that the Fritch practice was declining in both patient visits and revenue. The Fritch practice staff also complained that there had been a loss of control and visibility of expenses for the practice because of PRG's accounting procedures, including the various forms and coding required by PRG, which doubled their

- 44 -

bookkeeping efforts. About four weeks later, in early-1997, Cavanaugh received a fax from regional manager Glen Yamata, whose responsibility included the Fresno practice. The document was a financial statement prepared by PRG's corporate finance department showing that Dr. Fritch's practice produced about $200,000 in revenue to PRG, which constituted its 35% of overall profits. Thus, Cavanaugh recognized that this calculation meant *that the practice had to realize at least $500,000 more in revenue than it actually received* for PRG's figures to be accurate. Cavanaugh could not understand how PRG could have made such a miscalculation since the Fritch Eyecare Center financial data she personally reviewed had been sent to the Company finance office on a regular basis and did not forecast a 1996 profit. Upon completion of the review, Cavanaugh submitted a written report to the attention of PRG's Chief Accounting Officer Bingham that identified the various problems discovered and detailed the *actual* financial loss suffered. Cavanaugh then called Bingham to address the discrepancy between what was actually produced and what PRG had on its books. After Cavanaugh described the difference in detail, Bingham's response was simply: "Don't worry about it. *You* must have made a mistake." She protested that no mistake was made – the records and condition of the practice were obvious, it was running at a loss of $200,000 – and, as the regional director told Bingham, PRG's financial statement for the Fritch practice showed a $200,000 management fee for that year, which was impossible based on the practice's actual performance. Again, his response was simply: "Don't worry about it." Bingham did not want to discuss the matter any further.

112.    Cavanaugh knew that the required revenue-based "flash reports," which were supposed to be submitted on a weekly basis, were used by PRG as a basis to prepare financial statements for each practice, and were the basis of the Company's quarterly financial reports. But the director's reviews showed that when many practices failed to provide weekly flash reports, the Company simply created them using its own projections for patient visits, surgeries, revenue generated, and adjustments for reimbursement

agreements – a creation that resulted in artificially inflated financial statement revenues and profits that PRG reported quarterly.

113. Cavanaugh, based on her review of some fifty PRG practices, recognized that the conversion of cash reports from practices to the accrual method of accounting for PRG produced financial statements that were of no use to the physicians and which overstated revenues. The explanation was simple: PRG recognized revenues derived from *earnings projections* from practices rather than their *actual* financial performance. In fact, according to the regional director, at a minimum, the Company projected that each practice would continue to produce the same level of revenue or greater than what the practice was currently producing, and derived its recognized revenue from these projections. Through communication with PRG's finance department staff members, including Lori Downing, the regional director learned about the corporate practice that allowed the Company to provide monthly reports to regional managers identifying practice performance – even for practices that had not submitted monthly flash reports.

114. Cavanaugh knew that after practices submitted a Practice Management Month-End Report, PRG's version of the collective practice data was a report titled "Month-End Close," which was produced for each practice in an annualized format. For example, the June report reflected the data from January through May, plus June. When the regional director reviewed these PRG monthly reports, during her reviews at some 50 practices, the information seemed *false on its face*. For example, the report generated for one practice showed the same number of cataract surgeries for each of the prior several months. When the regional director inquired of a corporate financial representative how the number of cataract surgeries could have been exactly the same every month, the answer was that this practice was one that did not submit weekly flash reports, so PRG simply approximated, even though this data was used as a basis for Company quarterly financial statements: "*We just put the data in*" based on what was provided to PRG by the practice during acquisition negotiations. The regional director was so concerned about the ongoing discrepancies between PRG's month-end close reports and the actual practice data that the issue was

raised with Defendant and Chief Administrative Officer D'Amico. His sole response was "don't worry about it." In further discussions with finance employees, the regional director learned that they took pre-acquisition data – the numbers of cataract surgeries the practices performed, the number of patients and patient visits, and the revenue amounts associated with them – and then divided that data by 12 to get a baseline monthly projection for practices that did not submit flash reports. Those monthly projections were then increased by three to five percent, and those calculations were used in the PRG month-end-close reports as though the practice had actually experienced the reported volumes, even though, by 1996, all same-store data showed a significant decline.

115.    *In sum*, Dawn Cavanaugh, as midwest regional director, saw first-hand that PRG falsely reported revenue, as shown by comparing practice flash reports against the Company's financial reporting – the *actual* data from flash reports were significantly lower than the accounting prepared by PRG.

116.    Moreover, Cavanaugh knew that there were practices – even large groups – that did not produce any data. EyeCorp, acquired in March 1996, was one of those large groups, that never produced flash reports. Based on communications with other regional managers, including Mark Rosenberg, Craig Smith, Kevin Smith, Glen Yamata, Tony Ruvinski, optical consultant Carolyn Salvatto, and Deb Hurdman, who was involved with many EyeCore practices, during weekly conference calls and through other contacts, the regional director knew that acquired practices across all regions reported *actual* performance data that were far below PRG's reported accounting for those practices, which was created based on accrued projections from the acquisition agreement. Moreover, Cavanaugh knew there were at least $1 million in stale receivables at the EyeCorp practices because the doctors carried receivables on their books as assets for much longer than is proper.

117.    In addition, Cavanaugh discovered that adjustments were not recorded properly, and may have been intentionally falsified, particularly for the EyeCorp practices. Actual gross billings by a practice were not indicative of what the practice realized in

- 47 -

revenue, because billings were subject to an allowable reimbursement amount under insurance contracts or Medicare and Medicaid. Cavanaugh saw PRG month-end-close reports that broke out amounts for Medicaid billing with an adjustment showing that 90% of that amount would actually be owed as revenue, and therefore booked as revenue. But because Medicaid reimbursement had significantly declined over the last several years, and was then only approximately twenty to thirty percent, Cavanaugh wondered how PRG could justify a receivable based on such an inflated reimbursement percentage and whether Andersen, PRG's outside auditor, would identify such a glaring red flag and question the practice.

### Bingham, D'Amico, Moore and Owen Knew Throughout the Class Period That the Company Was Unable to Properly Reconcile its Accounts

118. Declining Medicare and Medicaid reimbursement caused escalating financial difficulties for practices during 1996 and 1997. In particular, by spring 1997, Cavanaugh received many complaints from practices about their inability to make scheduled payments for management fees as their government-regulated reimbursements declined, causing declining practice revenues. Yet the PRG 35% management fee remained constant.

119. The Company routinely failed to collect from third-party carriers, particularly Medicare agencies and independent companies. For example, each type of lens had a separate code that insurance forms required for payment. PRG required its acquired practices to enter everything according to its code book so that an insurance company could be electronically billed. In doing so, PRG eliminated the acquired practices' independent Medicare reimbursement numbers, leaving third-party payors owing thousands of dollars in Medicare payments to practices that were never paid because PRG never applied for payments under the proper Medicare number. Those payments were left in limbo and, over time, were lost because they had never been applied for. Moreover, PRG failed to provide not only correct information to Medicare for which payment was denied, but adequate information on claim forms, which also meant claims were denied.

Instead of resubmitting the claims with adequate information, the Company simply wrote them off.

120. Drs. Hauber and Westfield, and doctors and staff at other clinics, confirm that PRG was unable to convert acquired practices' cash-based accounting to accrual accounting, while promising to handle Medicare, Medicaid, and other third-party-payor billing and payments. In fact, many acquired practices continued to do the billing themselves. Dr. Hauber's practice in Tampa had to obtain a different Medicare number post-acquisition, yet subsequent billings for Medicare payments were rejected because his practice did not have the correct number. To solve this very costly confusion, after PRG substituted its Medicare reimbursement numbers, Dr. Hauber's practice did not rely on PRG to conduct the Medicare collection effort – his staff pursued collections without the Company's involvement. Likewise, PRG promised Dr. Hauber that it had personnel dedicated to obtaining lower-cost insurance plans, but never delivered on this promise.

121. Former corporate VP Michael Casas also confirms that ongoing problems with the affiliated doctors stemmed from the fact that because PRG kept its books on an accrual basis while practice books were kept on a cash basis. "Reconciliation was a nightmare" and the Company's inability to resolve the problem greatly limited its ability to manage the practices, which ultimately caused a number of doctors to leave their PRG contracts. Moreover, Casas, who worked directly with Defendants Moore and Owen, echoes Pamela Westbrook's acknowledgment that Andersen performed the Company's book-closing operations while John Bingham was PRG's Controller and Chief Accounting Officer.

122. PRG could not explain the differences between the cash and accrual bases for accounting. Sandy Freidman, at the Orlando CBO, told Jolene Loos, Dr. Hauber's CPA in Tampa, on February 8, 1998, that he would get back to her on her repeated accounting-reconciliation questions, and Steve Cielewich, the regional manager, at about the same time, responded that "they were working on it." Loos also testified at her deposition that she never received backup data so that she could agree or disagree with the information

that she received from PRG concerning the cash versus accrual-accounting differences. She said the Company was never able to provide information as to what it put into which expense categories, what it accrued, and why. Sandy Freidman came to Loos's office on February 8, 1998, and spent two or three hours going over printouts trying to clear up discrepancies in the month-by-month accounting and to identify the discrepancies, but he was unable to get the data from the Dallas headquarters to make the reconciliation. As Loos went through the 1997 report with Freidman, he was unable to offer explanations for the discrepancies, even after he called someone at corporate headquarters to get the information that he needed.

123.    Jolene Loos, Dr. Hauber's CPA in Tampa, reports that before his practice was merged with PRG she received timely and accurate financial information from Diane Smith, his in-house accountant. But after the merger, Loos was unable to get timely and accurate financial reports on a monthly basis, and she could not obtain bank reconciliations, so she never knew how much was in the practice's bank account. Moreover, although the Company wanted Hauber to move to accrual accounting, PRG neither collected the necessary information to do accrual accounting nor did it use the information that it had correctly, thus there was a continuing clash between cash accounting at the practice versus accrual accounting done by PRG. Not only were the monthly financial statements incorrect, they were untimely, often up to five months behind. When she asked PRG accounting staff about these discrepancies, Loos was unable to obtain an explanation or backup data because, in her view, the PRG accounting staff could provide no answer about how or why they made their calculations.

### Individual Defendants Failed to Deliver the Promised Operational Expertise Necessary to Enable Doctors to Achieve Revenue Growth

124.    The centerpiece of the PRG business model was the CBO – combined-business or central-billing office – but, in practice, it never worked as PRG extolled. For example, Dr. Hauber, a PRG physician, recalls sending his P&L statements to the PRG CBO, which was really the AOI Central Office in Orlando, after the Company's acquisition of AOI, but

the Orlando accounting office was unable to provide centralized services for any practices other than former AOI practices.

125.   Employees of acquired practices were listed as PRG employees, but nothing else changed. For example, the Company did nothing to guide or assist former Sunshine Vision employees – or any others – in dealing with its systems, even though Dr. Hauber paid their salaries. That is, the payor of his employees was changed from Dr. Hauber to PRG, which signed their checks, but clinic expenses were charged against his revenue. Meanwhile, PRG was admittedly "bogged down" with paper work. Dr. Hauber's office manager, Diane Smith, reports that PRG staff complained about "too much information," even though the Company could never provide an accurate and timely monthly P&L statement, and cash-based and accrual-accounting systems were never integrated. *In sum*, as shown by Dr. Hauber's experience, PRG supplied practices with no financial data about their progress or current financial position.

**Contrary to His Representations Moore Knew that
the Company Lacked the Ability to Provide the Promised
Operational Expertise, as Demonstrated by Two Company Physicians**

126.   PRG represented to all owners, including Drs. Hauber, Soper, Shepherd, and Westfield, that the Company would assemble the acquired practices into an efficient, profitable network and would generate accurate financial information, but this representation was untrue – promised, but never delivered. In their experience, echoed by other practitioners, practices were promised efficiencies in group purchasing, but they paid *higher* prices not lower ones through PRG's group-purchasing purported discount. Likewise, health-insurance benefits for practice employees were *more* costly, with fewer benefits under PRG's health insurance. The purchase of medicines and drugs through the Company was extraordinarily burdensome, with practices forced to use PRG's purchasing network even though it was time-consuming, costly, and delivery was not timely. *In sum*, PRG *increased* the burdens on practices and on the vendors servicing them, as D'Amico admitted as the Class Period closed.

127.    When the Company took over practices, doctors called PRG's headquarters in Dallas to ask what they should do with the invoices now that they were no longer allowed to write checks to pay them. They were told "just send the stuff to us." Vendors who had been paid timely by acquired practices before PRG were now not getting paid on time or at all. Moreover, failure to pay vendors on time meant that practices were losing discounts for timely payments.

128.    Dr. Shepherd and his partner in Las Vegas, Dr. Steve Hansen, were permitted to draw 50% of their projected salaries during 1996 in monthly payments, and at the end of that year PRG was to generate a final accounting that would split profits, with 65% going to Shepherd and Hansen after subtracting their month draws. But Dr. Shepherd recounts that when PRG finally provided a "strange form of a profit-and-loss statement," that "made no sense at all," PRG's accounting showed that it owed *no* money to the partners.

129.    It was clear to Drs. Shepherd and Soper that Moore's pre-acquisition basic promises were false when made. *First*, Moore represented that, because the Company would continue to make acquisitions, PRG's income would increase and physicians would realize an enhanced value because the Company would be growing. *Second*, as a result, Moore promised there would be an increase in per-store profits, resulting from PRG's operations as a *management* company. Drs. Shepherd and Soper saw firsthand that physicians did not realize an enhanced value from PRG's apparent growth, and there was no increase in per-store profits, because the Company delivered virtually nothing in the way of management expertise and marketing to grow individual practices, and the promised integrated accounting – the centerpiece of PRG's acquisition sales pitch – was a flat lie.

130.    Doctors at acquired practices, instead of seeing their revenue increase because they were spending more time with more patients, saw their take-home pay decline. When doctors demanded accurate financial statements, the Company produced one document for an entire region. In many cases physicians learned that their individual businesses had not generated enough money to pay their own bills. Dr. Kenneth Westfield, of Westfield

Eye Center in Las Vegas, one of PRG's founding affiliated practices, served on its board, along with all of the other founding-practice doctors. He was paid once a year after all of his bills were paid, but he waited six months for a paycheck after 1996 ended, only to learn – without explanation – that his Company account was overdrawn by thousands of dollars.

**Bingham, D'Amico, Moore, and Owen Knew Throughout
the Class Period that the Company Failed to Provide
the Promised Operational Expertise, as a Board Member
and Founding Physician Repeatedly Informed Them of
This Deficiency**

131.    Dr. Ken Westfield had many telephone conversations – beyond his discussions at board meetings – with Moore, D'Amico, Bingham, and Owen about same-store sales trending downward for most practices within a few months after being acquired by PRG, a trend that was well known to the executives and the board by mid-1996. For Dr. Westfield and other physician board members this was further evidence that PRG's acquisitions only burdened those business with additional accounting and bookkeeping requirements, purchasing procedures, and technical issues that detracted from normal operations.   Moreover, since the Company could not provide accurate financial information, doctors and their staffs worked on independent ways to get some idea of costs, revenue, and profits – a process that was exacerbated when, if at all, financial reports were ultimately sent by the Company to physicians that proved to be based on inaccurate information and virtually impossible to understand.

**D'Amico, Owen, and Bingham Knew Throughout the
Class Period that the Company Failed to Provide the
Promised Operational Expertise, as a Regional Director
Informed Them of This Deficiency**

132.    Dawn Cavanaugh, midwest regional director for PRG, by visiting many and reviewing the data for some 50 PRG practices, found that beyond the discrepancy between actual financial data and that which PRG reported, many practices were not repaying loans that had been extended upon acquisition with favorable credit terms by the Company. Cavanaugh recognized that no one in corporate finance was monitoring whether these loans were being repaid.  As but one example, Cavanaugh found a Chicago practice in

early-1997 with a loan balance due of over $200,000, and no payments on the loan made as a part of an acquisition agreement just one year old. She reported this shortfall to CFO Owen, who directed her to a PRG finance manager, Lori Downing, who was asked if anyone was tracking whether practices were repaying loans. After a few days, Downing responded: "You're right, we haven't been sending bills out to the practices, and a lot of them are not paying."

133.    Cavanaugh attended a dinner in St. Louis in the Spring of 1997 with doctors from Eye Health Care, at which Chief Administrative Officer D'Amico and regional director Johnny Bond spoke. During the dinner, physicians explained how declining reimbursements and the lack of accounting integration and infrastructure made it impossible to increase revenue production, which resulted in great difficulty in paying management fees to PRG, especially when there was no practice management in return from the Company. D'Amico's response was hostile: *We don't work for you. You work for Emmett Moore.*

### Anderson Failed in its Role as Outside Auditor

134.    Dr. Ken Westfield, a founding board member, reports that Andersen neither made any presentations to the board nor did it ever raise concerns from its audits of PRG's financial data and accounting controls. Thus, Dr. Westfield and the other board-member physicians and others whose practices had been acquired – all of whom had been concerned about the future viability of the Company since shortly after the IPO – were "shocked" with the report from the outside consulting firm that confirmed their complaints and verified the severity of PRG's operational problems and the extent to which its financial condition had deteriorated.

135.    Pamela Westbrook was PRG's CFO from April to October of 1998 (five months after the Class Period), having succeeded David Real. She corroborates allegations about PRG's lack of adequate infrastructure – both staff and systems – which includes the fact that when she began her duties as CFO she found Andersen "was doing PRG's books." That is, Westbrook explains, *Andersen had been "actually performing the closing on PRG's*

*books,* rather than acting as an independent auditor of the closed books," and she "was floored by Andersen's participation." Westbrook knew that Owen, PRG's CFO during most of the Class Period, had been an Andersen partner. Mark Kingston, the VP and Chief Development Officer who negotiated the PRG acquisitions, also affirms that Owen was in charge of PRG's operational systems, including the accounting and operations systems, and that he was a former Andersen partner. Although movement from public to in-house accounting was not unusual, Westbrook emphasizes that "what was unusual was the fact that Andersen's staff had left the role of independent auditor and was now performing the role of PRG's employees." Consequently, when it came time to audit PRG's financial statements, Andersen was auditing its own work, thus, it was not independent. Westbrook says that it was Andersen's staff who explained to her, as the newly arrived CFO, "how PRG's accounting system works," which particular staff members were assigned the responsibility of performing particular tasks concerning "accounting elements," and the status of the Company's reporting information.

136. Dawn Cavanaugh, midwest regional manager, knew that the financial reporting by the Company was consistently inaccurate, and there was "no rhyme or reason" that she could determine that justified PRG's inability to report accurate data to individual practices – in the director's words, "Most of the time the financial statements were generally late and 'not even close' when compared to the actual performance by the practice." Moreover, PRG was unable to determine in many cases whether a practice had paid its management fee, thus she encountered financial statements reflecting balances for management fees owed when, in fact, doctors had already paid them, and in other cases the statements reflected lower amounts owed when higher amounts were due. And without the ability to generate accurate financial data, and without internal controls to manage the financial data and collect what was owed from the practices, PRG was victimized by opportunistic doctors, from the regional director's review, who realized that the Company could not keep its books straight and was not reconciling its accounts. Ms. Cavanaugh is clear that PRG's most significant management-practice failing was that *many*

*acquired practices – some multi-million-dollar businesses – could never tell day-to-day whether financial obligations could be met, including payroll.* Moreover, while reviewing scores of PRG practices over the last year of the Class Period, Ms. Cavanaugh *neither heard from, nor saw, any Andersen auditors* – troubling to her since, with such an obvious lack of corporate accounting controls, she felt there was no way PRG could be reporting accurate financials.

137.    Dr. Ken Westfield, a founding board member, reports that Andersen never made any presentations to the board, nor did it ever raise concerns from its audits of PRG's financial data and accounting controls. Thus, Dr. Westfield and the other board-member-physicians and others whose practices had been acquired – all of whom had been concerned about the future viability of the Company since shortly after the IPO – were "shocked" with the report from the outside consulting firm that confirmed their complaints and verified the severity of PRG's operational problems and the extent to which its financial condition had deteriorated.

**Andersen Violated Numerous Principles and Provisions of GAAS and GAAP by Improperly Certifying PRG's Books**

138.    Dawn Cavanaugh, midwest regional manager, knew that the financial reporting by the Company was consistently inaccurate, and there was "no rhyme or reason" that she could determine that justified PRG's inability to report accurate data to individual practices – in the director's words, "[m]ost of the time the financial statements were generally late and 'not even close' when compared to the actual performance by the practice." Moreover, PRG was unable to determine in many cases whether a practice had paid its management fee, thus she encountered financial statements reflecting balances for management fees owed when, in fact, doctors had already paid them, and in other cases the statements reflected lower amounts owed when higher amounts were due. And without the ability to generate accurate financial data, and without internal controls to manage the financial data and collect what was owed from the practices, PRG was victimized by opportunistic doctors, from the regional director's review, who realized that

the Company could not keep its books straight and was not reconciling its accounts. Ms. Cavanaugh is clear that PRG's most significant management-practice failing was that *many acquired practices – some multi-million-dollar businesses – could never tell day-to-day whether financial obligations could be met, including payroll.* Moreover, while reviewing scores of PRG practices over the last year of the Class Period, Ms. Cavanaugh *neither heard from nor saw any Andersen auditors,* which was troubling to her since, with such an obvious lack of corporate accounting controls, she knew there was no way PRG could be reporting accurate financials.

### FALSE FINANCIAL STATEMENTS

139. To overstate PRG's revenues, net income and EPS during the Class Period, Individual Defendants caused the Company to violate GAAP and SEC rules by improperly recognizing revenue on management services for which it could not reasonably expect to ever be paid due to its woefully inadequate internal controls, which made collection improbable, and for revenue PRG had not earned due to its inability to provide the services promised to physicians. PRG failed to adequately accrue reserves for its uncollectible accounts receivable and receivables from affiliates, and failed to account for financial impairment caused by the over-valuation of EquiMed when it became aware of the need to write off EquiMed's assets.

140. PRG reported the following financial information during the Class Period:

|  | 1995 | 1stQ 96 | 2ndQ 96 | 3rdQ 96 | 4thQ96 | 1stQ97 | 2ndQ 97 |
|---|---|---|---|---|---|---|---|
| Total Revenues | $26.4m | $36.2m | $46.6m | $60.5m | $84.9m | $98.5m | $107.0m |
| Net Income | $1.7m | $ 2.1 m* | $ 3.3m | $ 6.05m* | $6.8m | $4.7m | $3.2m |
| EPS | $0.28 | $ 0.13 * | $ 0.16 | $ 0.22 * | $0.24 | $0.16 | $0.11 |

June 2, 1999*  Excluding Merger Charges.

141. The Company later included the interim results in Form 10Qs and its annual results in a Form S-1 and a Form 10-K filed with the SEC. The annual financial results were included in audited financial statements, which were accompanied by an unqualified audit

report by Andersen. This report was false and misleading as described in ¶¶157-172. The Form 10Qs, which were all signed by Owen and Bingham and reviewed and approved for publication by Andersen, each represented the following:

> In the opinion of management, the accompanying consolidated financial statements include the accounts of the Company and all adjustments necessary to present fairly the Company's financial position at [the respective balance sheet date], its results of operations for the [periods then ended] and its cash flows for the [periods then ended].

142. This statement was false and misleading as to the financial information reported in the Company's SEC filings for 1995, all of 1996, and first-quarter and second-quarter 1997, because such financial information was neither prepared in conformity with GAAP nor was the financial information "a fair presentation" of the Company's operations due to its improper revenue recognition and inadequate reserves related to the management services provided to many of its acquired practices. PRG had not earned the revenue and could not reasonably expect to collect for those services because of its complete lack of internal controls necessary to provide assurance of collection, causing its financial results to be presented in violation of GAAP and SEC rules.

143. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

144. Moreover, pursuant to §13(b)(2) of the 1934 Act, PRG was required to "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that – (i) transactions are executed in accordance with management's general

or specific authorization; (ii) transactions are recorded as necessary (I) to permit the preparation of financial statements in conformity with generally accepted accounting principles ...." 15 U.S.C. §78m(b)(2).

145. According to Appendix D to Statement on Auditing Standards No. 55, *Consideration of the Internal Control Structure in a Financial Statement Audit* ("SAS 55"), management should consider, among other things, such objectives as (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

146. GAAP, as set forth in FASB Statement of Concepts ("Concepts") No. 5, states that revenue should not be recognized until it has been both earned and is collectible. Concepts No. 5, ¶83 states in part:

> Revenues and gains generally are not recognized until realized or realizable.... Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash....
>
> ... Revenues are not recognized until earned ... and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

(Footnotes omitted.)

147. GAAP, as set forth in FASB Statement of Financial Accounting Standard ("SFAS") No. 5, ¶¶8, 22-23, requires that when it is probable that receivables or a group of receivables or some portion thereof will not be collected, a loss should be recognized.

148. SEC Regulation S-K, Item 303 (17 C.F.R. §229.303(a-b)) requires that issuers include a Management's Discussion and Analysis ("MD&A") section as part of its Form 10Qs, and that the MD&A should provide information about any significant elements of the issuer's income from continuing operations which are not necessarily representative of the issuer's ongoing business.

149. Contrary to this requirement, PRG and Andersen failed to inform readers of its financial statements as to the extreme risk that existed with respect to collection of its receivables arising from its management-service fees, and in its 1996 Form 10Qs stated the following:

> The Service Fees payable to PRG by these practices under the service agreements (Service Agreements) vary based on the nature and amount of services provided. Such fees are payable monthly and consist of various combinations of the following: (i) percentages ... of revenues or percentages ... of the earnings of the affiliated practices, relating to professional services and certain other non-medical services, depending on the scope and breadth of the services provided, (ii) all revenues, or a substantial portion of revenues, relating to facility and other non-physician fees with respect to certain assets owned by PRG, (iii) operating and non-operating expenses of the practices paid by PRG pursuant to the Service Agreements and (iv) certain negotiated performance and other adjustments.

*   *   *

> The amounts due from the affiliated practices include management service receivables, receivables from the practices for certain expenses being paid on their behalf and certain other receivables. The receivables due from certain of the affiliated practices are collateralized by a security interest in the affiliated practices, receivables from third-party payors and patients.

150. Concealed from the public were severe, internal control problems that prevented Andersen and PRG's management from even knowing how much in management fees should be accrued and that apprised PRG's management of the fact that it was likely that millions of dollars of the service fees the Company was recognizing as revenue would never be collected. Moreover, PRG failed to deliver the services it promised such that it had not earned the management fees it improperly recognized as revenues. The internal control problems included the following:

- PRG did not conduct adequate due diligence into many of its acquisitions – in most cases virtually none – during 1996 and 1997 to even know what the acquired practices' accounting capabilities were as far as providing reliable, timely and relevant information to the Company about the amount of fees payable. With so little understanding of the practices' accounting capabilities, PRG had no ability to make changes to the practices' accounting systems.

- The Company did not have mechanisms in place to adequately follow up with practices that failed to provide timely information. For many practices during 1996 and 1997 PRG received no information about their financial results and services provided, and PRG has admitted that the information in its Form 10Qs was not reliable.

- 60 -

- Some of the acquired practices had never been able to generate monthly or quarterly financial reports – a material weakness that did not change upon being acquired by PRG. But then, the Company could not guarantee monthly financial data either. Accordingly, these same practices failed to pay management fees to the Company, which did not have in place any procedures for determining the accurate fee owed or for collecting these fees.

- PRG's infrastructure was so inadequate, in relation to its growth, that many times it did not pay doctors it employed in Florida, Nevada, Arizona, and elsewhere for months.

- In exchange for 35% of physicians' profits after expenses, PRG promised to provide integrated and efficient accounting and management expertise, including telling Drs. Soper and Shepherd of Las Vegas, at an August, 1995 presentation in Sun Valley and in many conversations thereafter, that the Company would provide expert business managers it recruited and physicians when needed in growing practices in a campaign to bring "economies of scale" through efficiency, increased profit margins, and practice growth. But Drs. Shepherd and Soper noticed immediately after their acquisition that PRG was unable to provided timely accounting data, if at all, and that financial statements, when received, were several months late and the data woefully inaccurate. In fact, pre-acquisition, Moore and Chambers represented to Drs. Shepherd and Soper that PRG would computerize business operations and accounting for acquired practices and "tie them up" in an integrated system – but PRG had no such system and never developed one.

- Drs. Soper and Shepherd of Las Vegas saw firsthand the falsity in PRG's promised management expertise. Not only did the Company fail to provide the pre-IPO practice-management talent promised, but when it did get involved the results were disastrous. When the Company purchased Westfield Eye Clinic, a founding practice, with it came a substantial Nevada contract with Sierra Health Services. In 1997, that contract came up for renegotiation, and PRG's consultant, John Pinto, represented by the Company to be an expert in managed-care contracts, was dispatched to renegotiate, along with Operations VP Bill Chow. Chow later reported to Drs. Soper and Shepherd that Pinto's performance resulted in the contract being lost overnight, which virtually destroyed Westfield's practice and caused his ambulatory surgical center to fold – *a major PRG asset that was gone in a year because the Company did not have practice-management expertise.*

- As part of its 1996 year-end audit, the Company had to request doctors to supplement financial information they had sent in months earlier because its systems were unable to generate the information.

- PRG *neither had the infrastructure in place nor the experienced practice-management talent* to effectively operate as a practice-management company. Chow states that PRG was never a "practice-management company," as represented from the IPO forward, but simply a "practice-acquisition company."

- Universally, acquired physicians repeatedly complained that, far from improving same-store sales and increasing profits, acquired practices had performed far better pre-acquisition in terms of earnings and growth than

- 61 -

after. Dr. Westfield's practice suffered a 30-35% drop in overall profitability post-acquisition, and the Company's failure to integrate groups of practices was a principal reason why the promised economies of scale were never realized and same-store profit declined.

- Most of the acquired practices had historically been on cash-basis accounting systems. PRG insisted the practices convert to accrual-based systems, which caused several of the practices' accounting systems to fail because the information provided was inaccurate. And then the Company converted back to cash-basis accounting.

- Drs. Soper and Shepherd met with CFO Bingham in June 1997 at the Shepherd Eye Clinic in Las Vegas, and reported to him that PRG's failure to integrate or manage the acquired practices left them in a state of disarray, particularly their accounting. Bingham was accompanied by an accounting consultant, whose initial assessment of the accounting operations set up by Dr. Soper at the Las Vegas CBO was that all he'd done was "put together a bunch of bookkeepers," when what was needed was an accountant. Thereafter, PRG recruited Sue Takahashi, but she proved soon to be so incompetent and unable to understand the Vegas operations that it was impossible for her to assist in the accounting integrations with PRG operations. Aside from Bill Chow, who came to PRG with one of the founding practices, Takahashi was the *only* PRG "manager" in any sense who was purportedly installed to perform accounting-functions integration *and she was gone within 90 days*. This was in direct contradiction to what Emmett Moore told Drs. Soper and Shepherd and the other August 1995 Sun Valley attendees, and in subsequent conversations with Moore, Chambers, and Bingham, who had represented that PRG would provide expert accounting and financial management and provide practices with monthly and quarterly reporting to demonstrate with financial data that the PRG economy-of-scale model made a profitable difference.

- Dr. Ken Westfield, a PRG physician board member, saw firsthand how PRG's lack of accounting systems virtually crippled financial reporting of the acquired practices, a view he expressed in board meetings throughout 1996 and 1997, joined by other director physicians from their own experiences. There was consensus that any attempt to get accurate financial information from PRG took months, and when and if it arrived, it was nonsensical.

151. Plaintiffs estimate the extent of PRG's misstated financial results, related to the Company's improper revenue recognition and failure to adequately reserve for uncollectible receivables, was misstated in its 1996 operating income (excluding merger charges) by a minimum of $1 million for Q1, $1.3 million for Q2, $1.9 million for Q3, and $3.0 million for Q4, and by a minimum of $4.0 million, and $6.0 million for Q1 and Q2 1997, respectively. PRG's 1995 results were similarly misstated due its improper revenue recognition on unearned fees and uncollectible receivables.

152. Footnote 1 to PRG's June 30, 1997 Form 10-Q stated:

The interim consolidated financial statements ... included herein have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission. Although the Company believes that the disclosures are adequate to make the information presented not misleading, certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. *It is suggested that these financial statements be read in conjunction with the financial statements and notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 1996.* In the opinion of management, the accompanying unaudited interim financial statements contain all adjustments, consisting only of those of a normal recurring nature, necessary to present fairly the Company's results of operations and cash flows for the periods presented.

153. Note 2, "Summary Of Significant Accounting Policies," to the December 31, 1996 Form 10-K financial statements, under the section "Intangible Assets," stated:

*The Company reviews the carrying value of the long lived assets at least quarterly on an entity by entity basis to determine if facts and circumstances exist which would suggest that the intangible assets may be impaired* or that the amortization period needs to be modified.... If impairment is indicated, then an adjustment will be made to reduce the carrying amount of the intangible assets to their fair value.

While acknowledging that they re-evaluate impairment quarterly, defendants failed to disclose by at least June 30, 1997, the impairment in the carrying value of the EquiMed practices, which they knew from the facts supporting their counterclaims.

154. Ultimately, the Company took reserves to account for its improper revenue recognition in earlier quarters. In Fall 1997 the Company revealed that it would have to implement new procedures relating to the collection of management fees and expense reimbursement, and that its losses to date were as much as $17 million. Additionally, the Company's reserve for bad debts, which was less than $6 million in 1995, was increased to more than $20 million at the end of 1996.

155. Due to these accounting improprieties, the Company and Andersen presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)   The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

- 64 -

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

156.    Further, the material, undisclosed, adverse information concealed by defendants during the Class Period is the type of information that, because of SEC regulations, national-stock-exchange regulations, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

## WHY ANDERSEN'S STATEMENTS DURING THE
## CLASS PERIOD WERE FALSE AND MISLEADING WHEN MADE

157.    With respect to PRG's financial statements for 1995 and 1996, Andersen represented, in reports dated 4/5/96, and 3/24/97, respectively, the following:

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Board of Directors and Shareholders of Physicians Resource Group,

Inc.:

We have audited the accompanying consolidated balance sheets of Physicians Resource Group, Inc. (a Delaware corporation) and subsidiaries as of December 31, 1994 and 1995 [or December 31, 1995 and 1996], and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 1995 [or 1996]. These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

*   *   *

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements

are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of the other auditors provide a reasonable basis for our opinion.

In our opinion, based upon our audits and the report of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of Physicians Resource Group, Inc. and subsidiaries as of December 31, 1994 and 1995 [or 1995 and 1996], and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1995 [or 1996], in conformity with generally accepted accounting principles.

ARTHUR ANDERSEN LLP

Dallas, Texas
April 1, 1996 [or March 24, 1997]

158. Andersen's unqualified audit opinions, however, were false and misleading because Andersen had failed to comply with GAAS and because PRG's financial statements were not prepared in conformity with GAAP, thus causing the reports to be a violation of GAAS and SEC rules. Indeed, having set up and extensively consulted on PRG's supposed accounting systems, Andersen knew or recklessly disregarded that PRG could *not* even generate accurate financial statements because PRG's management and internal-control systems were so inadequate. Nevertheless, Andersen remained silent and certified PRG's books, notwithstanding that it knew or recklessly disregarded that the Company's reported annual and quarterly revenues and net income for 1995, 1996, and 1997 were materially misstated.

**Key PRG Insiders Explain How Andersen
Failed in its Role as Outside Auditor and
Knew about PRG's Lack of Systems and Controls**

159. The SEC has stressed the importance of meaningful audits being performed by independent accountants:

Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. *Accordingly, the audit function*

> *must be meaningfully performed and the accountants' independence not*
> *compromised.*

SEC Accounting Series Release No. 296.

160. Andersen was not independent as to the Company's 1995 and 1996 financial statements – it set up PRG's initial MIS and consulted extensively on its information system. Thus, Andersen was essentially auditing its own work when it examined PRG's accounting-information system. Had the outside auditors honestly reported that it could not issue an opinion on the Company's 1995 and 1996 financial statements due to the complete lack of reliable financial reporting by the various PRG management practices, Andersen would have effectively admitted that its consulting and the MIS it set up for PRG were a complete failure. Moreover, PRG's internal controls were so lacking that Andersen personnel were doing PRG's books and had to close the books at quarter's end. Thus, when it came time for the audit, Andersen was auditing its own work and, as such, was not independent.

161. Pamela Westbrook was PRG's CFO from April to October of 1998 (five months after the Class Period), having succeeded David Real. She corroborates allegations about PRG's lack of adequate infrastructure – both staff and systems – which includes the fact that when she began her duties as CFO, she found Andersen "was doing PRG's books." That is, Westbrook explains, Andersen was "actually *performing the closing on PRG's books,* rather acting as an independent auditor of the closed books," and she "was floored by Andersen's participation." Westbrook knew that Owen, PRG's CFO during the Class Period, had been an Andersen partner. Mark Kingston, the VP and Chief Development Officer who negotiated the PRG acquisitions, also affirms that Owen was in charge of PRG's "operational systems," including the accounting and operations systems, and that he was a former Andersen partner. Although movement from public to in-house accounting was not unusual, Westbrook emphasizes that "what was unusual was the fact that Andersen's staff had left the role of independent auditor and was now performing the role of PRG's employees." Westbrook says that it was Andersen's staff who explained to

her, as the newly arrived CFO, "how PRG's accounting system works," which particular staff members were assigned the responsibility of performing particular tasks concerning "accounting elements," and the status of the Company's reporting information.

162. GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements. Statements on Auditing Standards are recognized by the AICPA as the interpretation of GAAS.

163. Andersen's responsibility, as PRG's independent auditor, was to obtain "sufficient competent evidential matter ... to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§110, 150. Andersen was required to maintain "an independence in mental attitude" in "all matters" related to the engagement. AU §220.

164. Andersen's representations concerning PRG's 1995 and 1996 financial statements were false and misleading because those financial statements were neither prepared in accordance with GAAP nor had Andersen conducted its audits in accordance with GAAS. Andersen was aware of at least the following factors when it issued its unqualified report on PRG's 1995 financial statements:

(a) Many of PRG's receivables were uncollectible and physicians and acquired practices were refusing to pay the Company due to disputes over the quality of the Company's services or because they had not been billed properly due to its lack of adequate billing systems;

(b) The Company's internal controls were so substandard that it could not generate financial statements for many of the practices it had acquired in a timely or accurate manner, thus it could not supply sufficient documents to Andersen to adequately conduct its audits;

(c)     Because Andersen had designed PRG's MIS and continued to consult with the Company about the system, the auditors were very familiar with its weaknesses;

(d)     Andersen performed closing procedures as to PRG's books and they performed quarterly reviews of PRG's interim financial statements and learned of the Company's problems in consistently generating accurate financial information from management practices;

(e)     Andersen was required by GAAS to confirm receivables, meaning it was required to send out confirmation letters to certain of the practices and physicians represented by the receivables (*see* A.U. §330.34); which resulted in negative responses due to the enormous amount of physician complaints about PRG's systems; and

(f)     Andersen's understanding of the internal-control problems led it to be unable to conduct certain auditing procedures necessary to obtain sufficient evidential support for the assertions by management.   But since PRG's top management was composed heavily of Andersen employees – four out of the top seven PRG officers were former Arthur Andersen auditors, including the CEO, the CFO, and the Controller – the auditors over-relied on management's representations.        165.    Andersen was aware of at least the following factors when it issued its unqualified report on PRG's 1995 and/or 1996 financial statements:

(a)     Many of PRG's receivables were uncollectible and physicians and practices were refusing to pay the Company due to disputes over the quality of its services or because they had not been billed properly due to its lack of adequate billing systems;

(b)     The Company's internal controls were so substandard that it could not generate financial statements for many of the practices it had acquired in a reasonable manner, thus it could not supply sufficient documents for Andersen to adequately conduct its audits;

(c)     Andersen had to step in and perform closing procedures because PRG's reporting processes were so deficient – Andersen was doing PRG's books;

(d)     Because Andersen had designed PRG's MIS, and continued to consult with the Company about the system, the outsider auditors were very familiar with its weaknesses;

(e)     Andersen performed quarterly reviews of PRG's interim financial statements and learned of the Company's problems in consistently generating accurate financial information from management practices;

(f)     Andersen was required by GAAS to confirm receivables, meaning it was required to send out confirmation letters to certain of the practices and physicians represented by the receivables (*see* A.U. §330.34);

(g)     Through attendance at board meetings, Andersen learned about the extreme problems PRG was having integrating practices since several PRG board members were physicians from acquired practices;

(h)     Andersen was aware that PRG's acquisition of EquiMed, which closed in November 1996, was not proceeding well – it was already resulting in disputes between PRG and former EquiMed owners while Andersen was auditing the Company's 1996 financial statements. In fact, PRG was obligated to make subsequent payments to EquiMed on 5/15/97, but it was not made and on that same day EquiMed filed an arbitration claim against the Company for the payment. The fact that the claim was filed on the same day the payment was due clearly indicates that EquiMed knew it would not be paid before 5/15/97. Thus, PRG's unhappiness with and failure to integrate the acquisition was evident during the time Arthur Andersen was carrying out its auditing procedures and interviewing PRG's management;

(i)     Andersen was intimately aware of the Company's internal-control weaknesses, which prevented PRG from generating financial statements for much of its business represented by practices it had acquired during 1996 and made it necessary for Andersen to be involved in closing PRG's books; and

(j)     Andersen's understanding of the internal-control problems led it to be unable to conduct certain auditing procedures necessary to obtain sufficient evidential

support for management's assertions. But since PRG's top management – including the CEO, the CFO, and the Controller – was composed heavily of Andersen employees, the outside auditors over-relied on their representations.

166.   Ultimately, PRG was forced to write-off of as much as $17 million for bad debts related to receivables on the books as of 12/31/96, which financial statements Andersen represented it had audited in accordance with GAAS and found them presented in conformity with GAAP. Moreover, on 11/13/98, PRG announced the resignation of its auditors, which Andersen attributed to:

> (1) its concerns regarding whether there exist internal financial controls and adequate financial reporting from affiliated practices necessary for the Company to develop reliable financial statements and (2) its belief that prior management of the Company had not taken steps to remedy problems disclosed to the Company by Arthur Andersen in a "material weakness" letter delivered in connection with Arthur Andersen's issuance of its opinion with respect to the Company's financial statements for the year ended December 31, 1997, as disclosed in the Company's Form 10-K for that period.

167.   In fact, Andersen knew that the problems with financial reporting by PRG's affiliated practices had existed for years, as had the internal control weaknesses and lack of accurate financial reporting capabilities.   And the Company's most significant acquisitions were made before 12/31/96, but Andersen waited until PRG was on the verge of insolvency before admitting that it was impossible to perform audit procedures sufficient to accurately report on the Company's financial statements.   Had Andersen complied with GAAS and informed management back in 1996 that the Company's financial reporting systems were completely unreliable and that it was impossible for PRG to report accurate financial statements, the Company would not have been able to carry out the misrepresentations alleged.

168.   Due to Andersen's false statements and failure to identify and modify its reports to identify PRG's false financial reporting, the outside auditors violated the following GAAS standards:

(a)   The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

- 71 -

(b)     The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

(c)     The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

(d)     The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

(e)     The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(f)     The third standard of field work is that sufficient competent evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

(g)     The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

(h)     The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

(i)     The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

(j)     The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

169.    In addition to consenting to the use of its false audit reports in PRG's 1995 and 1996 SEC Form 10-Ks, Andersen consented to the use of its reports in the Company's Registration Statements dated July 17, 1996, August 9, 1996, January 2, 1997, and June 5, 1997, which was also a violation of GAAS because Andersen knew or – absent extreme recklessness – should have known that the unaudited financial statements, including the offering documents, were presented in violation of GAAP.

170.    GAAS, as set forth in AICPA AU §711, Filings Under Federal Securities Statutes, states the following:

If an accountant concludes on the basis of facts known to him that unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement are not in conformity with generally accepted accounting principles, he should insist on appropriate revision. Failing that,

*   *   *

b.     If the accountant has not reported on a review of the unaudited financial statements or interim financial information, he should modify his report on the audited financial statements to describe the departure from generally accepted accounting principles contained in the unaudited financial statements or interim financial information.

In either case, the accountant should also consider, probably with the advice of his legal counsel, withholding his consent to the use of his report on the audited financial statements in the registration statement. AU §711.13.

171.    Andersen reviewed PRG's Registration Statements and knew that the Company had included audited and unaudited financial statements in each of them. Andersen knew or recklessly disregarded that PRG's purported revenues and earnings were materially misstated as alleged.

172.    Due to the facts known to or recklessly disregarded by the outside auditors at the time that it consented to the use of its reports on PRG's financial statements in the Registration Statements, Andersen should have concluded that PRG's unaudited financial statements, which were included in the documents, were not presented in conformity with GAAP.   Accordingly, Andersen should have insisted on a revision of the financial statements or – failing management's agreement to do so – should have  modified its reports to describe the departure from GAAP or considered withholding its consent to the use of its report.  Instead, in violation of GAAS, Andersen failed to modify its reports to describe the departures from GAAP and consented to the use of its unmodified reports in the Registration Statements.

## CLAIM FOR RELIEF I

### For Violation of Section 10(b) of the 1934
### Act and Rule 10b-5 Against All Defendants

173.    Lead Plaintiff incorporates by reference ¶¶1-172.

- 73 -

174.    Each of the defendants knew or had access to the material, adverse, non-public information about PRG's financial results and then-existing business conditions, which were not disclosed, and participated in drafting, reviewing, or approving the misleading statements, releases, reports, and other public representations of and about the Company.

175.    During the Class Period, defendants – with knowledge of or reckless disregard for the truth – disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of PRG's common stock during the Class Period.

177.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PRG's stock. Plaintiffs and the Class would not have purchased the Company's stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## CLAIM FOR RELIEF II

**For Violation of Section 20(a) of the 1934
Act Against Defendants Moore and Owen**

178.    Lead Plaintiff incorporate by reference ¶¶1-177.

DATED: March 13, 2002

STANLEY, MANDEL & IOLA, L.L.P.
MARC R. STANLEY
Texas Bar No. 19046500
ROGER L. MANDEL
Texas Bar No. 12891750
MARTIN WOODWARD
Texas Bar No. 00797693

_____
MARC R. STANLEY

3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  214/443-4301
214/443-0358 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
California Bar No. 68581
G. PAUL HOWES
California Bar No. 187772
RANDALL J. BARON
California Bar No. 150796
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

BERGER & MONTAGUE, P.C.
MERRILL G. DAVIDOFF
LAWRENCE J. LEDERER
LANE L. VINES
1622 Locust Street
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)

**Co-Lead Counsel for Plaintiffs**

N \DOCSAP\724 1\Pleadings\Longman\First Amended Longman Complaint.wpd

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were served March 20, 2002, on the following counsel via the method indicated:

| | |
|---|---|
| Mr. Charles W. Schwartz<br>VINSON & ELKINS LLP<br>2300 First City Tower<br>1001 Fannin Street<br>Houston, TX 77002-6760 | ☐ via certified mail, RRR<br>☐ via fax # 713/615-5504<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Mr. Dennis N. Ryan<br>ANDREWS & KURTH, LLP<br>1717 Main Street, Ste. 3700<br>Dallas, TX 75201 | ☐ via certified mail, RRR<br>☐ via fax # 214/659-4401<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Mr. Timothy W. Mountz<br>BAKER & BOTTS LLP<br>600 Trammell Crow Center<br>2001 Ross Avenue<br>Dallas, TX 75201 | ☐ via certified mail, RRR<br>☐ via fax # 214/953-6503<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Mr. Gregg C. Laswell<br>AKIN, GUMP, STRAUSS, HAUER & FELD, LLP<br>1900 Pennzoil Place – South Tower<br>711 Louisiana<br>Houston, TX 77002 | ☐ via certified mail, RRR<br>☐ via fax # 713/236-0822<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Mr. Edward S. Koppman, P.C.<br>AKIN, GUMP, STRAUSS, HAUER & FELD, LLP<br>4100 First City Center<br>1700 Pacific Avenue<br>Dallas, Texas 75201-4618 | ☐ via certified mail, RRR<br>☐ via fax # 214/969-4343<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |

MARC R. STANLEY